500 So.2d 626 (1986)
ESCAMBIA COUNTY COUNCIL ON AGING and Auto-Owners Insurance Co., Appellants,
v.
Willie A. GOLDSMITH and Division of Workers' Compensation, Appellees.
No. BI-237.
District Court of Appeal of Florida, First District.
December 23, 1986.
Rehearing Denied February 3, 1987.
*627 L. Kathleen Horton-Brown, of Clark, Partington, Hart, Hart & Johnson, Pensacola, for appellants.
Barry Silber, of Levin, Warfield, Middlebrooks, Mabie, Thomas, Mayes & Mitchell, Pensacola, for appellees.
En banc.
ZEHMER, Judge.
A majority of the court has determined to consider this case en banc pursuant to Fla.R.App.P. 9.331, and a majority of the judges participating concur in this opinion.
Once again we consider the statutory provisions in chapter 440, Florida Statutes, governing apportionment of permanent total disability benefits (PTD) due to the combined effect of a compensable injury and a preexisting condition. We review the order of the deputy commissioner entered pursuant to our decision in Escambia County Council on Aging v. Goldsmith, 465 So.2d 655 (Fla. 1st DCA 1985) (Goldsmith I). The basic issue concerns the legal effect to be given a permanent impairment rating in determining an award for permanent total disability. The obvious difficulties encountered by the deputy in trying to comply with our previous decision, as well as intervening decisions of this court, cause us to reconsider and recede in part from our opinion in Goldsmith I. We reverse, with directions to deny any apportionment in this case.
We do not take lightly the fundamental principle that the "law of the case" should, once announced, govern in all subsequent proceedings. But we have the power  indeed the responsibility  to reconsider and reverse a previous ruling that has become the "law of the case" when convinced, on a subsequent appeal of the same case, that our original pronouncement of the law was erroneous. Strazzulla v. Hendrick, 177 So.2d 1 (Fla. 1965).
Willie A. Goldsmith, the claimant, was injured September 16, 1981,[1] in a compensable accident. His doctor determined that he suffered a twenty percent impairment to his left leg, with one-half to three-quarters of this rating attributable to preexisting osteoarthritis. In an order entered March 12, 1984, the deputy found that claimant, although working without disability prior to his injury despite his preexisting condition, was removed from the job market by his injury, which prevented even light work on a regular basis, and concluded that claimant was permanently and totally disabled. Because there was no evidence that claimant suffered any economic disability prior to his September 1981 injury, the deputy declined, on grounds that chapter 440, Florida Statutes (1981), no longer permits apportionment of permanent total disability benefits, to apportion any part of the permanent total disability award to the preexisting condition. This court reversed, holding that permanent total disability benefits are subject to apportionment under sections 440.02(18) and 440.15(5)(a), Florida Statutes (1981), and remanded with directions "for the deputy to apportion out of the permanent total disability award that percentage of the award for permanent impairment caused by the natural progression of pre-existing conditions." 465 So.2d at 658.
Pursuant to this mandate, the deputy determined that one-half of the permanent impairment to claimant's left leg was due to the preexisting condition. He then converted the twenty percent impairment of *628 the leg to a whole-body impairment rating of eight percent, multiplied the eight percent rating by the one-half impairment of the leg due to the preexisting condition, and ordered that the resulting four percent be the percentage of the permanent total disability award apportioned out.
The employer and carrier have appealed the deputy's ruling, contending that our opinion in Goldsmith I required the deputy to apportion out at least one-half the permanent total disability award. Appellants' argument has required that we again closely review the pertinent statutory language, as well as our prior opinion, to determine exactly what was expected on remand. The argument of the employer and carrier would require that the fifty percent permanent impairment percentage rating for the leg be applied directly to the total permanent disability found by the deputy. Claimant argues that the amount of apportionment of the permanent total disability award must be based on consideration of all the facts in evidence, not just the permanent impairment rating attributable to the preexisting condition, because the preexisting condition had not disabled claimant from working prior to the injury.
The deputy encountered considerable difficulty in directly equating the statutory concept of "permanent impairment" as defined in section 440.02(21), Florida Statutes (1981), to the concept of "disability" as defined in section 440.02(9). He accepted claimant's argument that the effect of the permanent impairment rating of the left leg must be considered in relation to the disability of the body as a whole; and since the latter requires consideration of all the relevant factors and not just the impairment rating of the leg, appellants' argument for a direct fifty percent reduction of permanent total disability was not consistent with the statutory concept of disability and was not contemplated by the directions given in Goldsmith I.
After a thorough re-review of the statutory provisions pertinent to apportionment as they read before and after the 1979 and 1980 amendments to chapter 440, as well as several decisions construing the statutory language, we are convinced that our prior opinion erred in concluding that "permanent impairment" in the statutorily defined sense of "`any anatomic or functional loss' would include permanent, total loss of wage earning capacity" (465 So.2d at 657) and in directing the deputy to apportion out of the permanent total disability benefits "that percentage of the award for permanent impairment caused by the natural progression of pre-existing conditions" (465 So.2d at 658).
Our review and analysis is, of course, guided by the supreme court's recent admonitions in Daniel v. Holmes Lumber Company, 490 So.2d 1252 (Fla. 1986), that "Florida's workers' compensation laws are remedial in nature and the courts should resolve any doubts as to statutory construction in favor of providing benefits to injured workers," and that we should concentrate "on the plain language of the statutes themselves" and that "[w]hen the language of a statute is clear, courts may not look beyond the plain meaning of that language." 490 So.2d at 1256.
In Evans v. Florida Industrial Comm'n, 196 So.2d 748 (Fla. 1967), the supreme court's landmark decision on apportionment of permanent disability benefits under the Florida Worker's Compensation Act, the court plainly stated:
Section 440.02(19),[2] as well as the other apportionment provisions, Sec. 440.15(5)(c),[3] is a limitation on the operation *629 of the universally accepted maxim that the employer takes the employee as he finds him. In our earlier opinions we have adopted and relied on that maxim and have never expressly repudiated it. In particular see Allen v. Maxwell Co., supra, and Davis v. Artley Const. Co., supra. Since this maxim is a part of the basic philosophy of our workmen's compensation act, it follows that the apportionment provisions should be construed so as to minimize their inconsistency with it.

The obvious purpose of the apportionment provision of Sec. 440.02(19) is to relieve the employer of the obligation for that portion of his disability which is not the result of an industrial accident, but which is in some way attributable to a pre-existing disease or condition.
196 So.2d at 751 (emphasis added). The court held with respect to that statutory provision:
This language is unambiguous. It means that in cases in which a pre-existing disease is aggravated by industrial injury, the resulting disability, determined as of the time of the award, is to be considered as falling into three categories: (1) that which resulted directly and solely from the accident and which would have occurred even in the absence of the pre-existing disease; (2) that which resulted from the acceleration or aggravation of the pre-existing disease by the accident; and (3) that which resulted from the normal progress of the disease and would have existed had the accident never occurred. Disability falling within the first two categories is compensable under the terms of the statute. It is the purpose of section 440.02(19) to relieve the employer of disability within the third category by apportioning it out of an award. We so hold.
* * * * * *
As stated above, apportionment is proper only when and to the extent that the pre-existing disease either, (1) was disabling at the time of the accident and continued to be so at the time the award is made or (2) was producing no disability at the time of the accident but through its normal progress is doing so at the time permanent disability is determined and an award is made.
This, it seems to us, is the only logical and fair interpretation which can be given the statute. It recognizes the maxim that the employer takes the employee as he finds him, in that it does not charge against the employee diseased or weakened conditions which were not and would not have been disabling without the accident. On the other hand, it gives the intended effect to Sec. 440.02(19) by relieving the employer of the burden of paying for disability which occurred through the normal progress of the disease and was unrelated to the accident. When disability which is attributable to the normal progress of a pre-existing disease is deducted from the total disability found to exist, the remainder is logically and reasonably attributable to the accidental injury, either as a direct result thereof or as a result of the acceleration or aggravation of the pre-existing condition.
196 So.2d at 752-53. The court then stated, "The effect of this opinion is simply to hold that apportionment under Sec. 440.02(19) is proper only when and to the extent that a pre-existing disease produces disability independently of the accelerating or aggravating effect of an industrial accident." 196 So.2d at 754 (emphasis added).
The Evans decision is based on the underlying premise that an employer takes the employee as he finds him, and the employer becomes liable under the act for any disability of the employee to earn income *630 caused by an industrial accident. Only to the extent that the statute expressly provides for apportionment of any disability attributable to a preexisting condition is the employer excused from liability for a portion of the permanent total disability. Since the statute construed in Evans stated that "only acceleration ... of disability reasonably attributable to the accident shall be compensable," the employer was held to be excused from liability for that portion of the disability due to a preexisting condition which was not otherwise causally related to or aggravated by the industrial accident. Presumably, in the absence of appropriate statutory language, the employer would remain responsible for the entire disability so long as it is causally related to the industrial accident, without regard to the independent effect of any preexisting condition.
As discussed in our prior opinion, the statutory language construed in Evans remained in effect until the amendments made in 1979 and 1980. Goldsmith, 465 So.2d 655. See also McGarity v. Merit Electric Co., 473 So.2d 836 (Fla. 1st DCA 1985). The critical issue in this case is the extent to which these amendments evidence a clear and unambiguous legislative intent to substantially alter the doctrine of apportionment of disability benefits as construed in Evans.
The 1979 amendment to section 440.02(18) changed the definition of "accident" by eliminating all reference to the phrase "acceleration or aggravation of disability" and referring only to "acceleration of death reasonably attributable to the accident." Ch. 79-40, § 2, Laws of Florida.[4] In light of the principles of statutory construction and the rationale in Evans, this change in statutory language would appear to require the employer to be responsible for the whole of any disability caused by a covered accidental injury, with the sole exception that in the event the injury results in death, only the extent of acceleration of death attributable to the accident shall be compensable. It could be argued that the legislature's failure to include reference to permanent disability would operate to limit the application of apportionment to death cases only, leaving all disability cases beyond the reach of the apportionment doctrine and making the employer liable for the whole disability.
The following year the definition of "accident" in section 440.02(18) was amended by adding the following underscored language: "[O]nly acceleration of death or the acceleration or aggravation of the preexisting condition reasonably attributable to the accident shall be compensable, with respect to permanent impairment or death." Ch. 80-236, § 2, Laws of Florida. Unquestionably, this amendment made the specific "permanent impairment" benefits provided in section 440.15(3)(a) subject to apportionment. But the question remains, since the definition of "accident" remained silent with respect to "disability," must it nevertheless be inferred that "permanent impairment" necessarily includes or equates to "permanent disability" as that term is used in awards for permanent total disability? Goldsmith I suggested an affirmative answer to this question. However, our subsequent decision in Lemus v. Industrial Sites Services, 482 So.2d 472 (Fla. 1st DCA 1986), and further examination of chapter 440 indicate that no such construction would be permissible and consistent with the purposes of the act.
In Lemus the deputy commissioner found that the claimant was permanently totally disabled; but he also found that the claimant suffered sixty percent preexisting intellectual impairment, so arithmetically apportioned out sixty percent of the PTD award. On appeal, this court reversed for error in making the apportionment. First, it was noted that a disability award must be determined by the deputy upon consideration of all the relevant factors, in addition *631 to impairment, i.e., "`age, industrial history, training and education, motivation, work experience, work record, diligence and the like.' Regency Inn v. Johnson, 422 So.2d 870, 877, note 5 (Fla. 1st DCA 1982); H.S. Camp & Sons v. Flynn, 450 So.2d 577, 580 note 3 (Fla. 1st DCA 1984)." 482 So.2d at 473. It was next observed that the sixty percent psychiatric impairment could not be directly subtracted from the permanent total disability award because:
Although the award in this case is based upon the medical evidence of total psychiatric impairment, it clearly is not an award for total permanent impairment because § 440.15(3)(a), Florida Statutes, limits impairment awards to other defined losses not including total physical or psychiatric impairment. It is equally clear (even assuming that the apportionment defense applies to permanent total disability awards under Chapter 440 as now amended) that the deputy's reference to the "60% ... disability which pre-existed the ... accident" is based expressly on medical evidence of pre-existing impairment, i.e., Dr. Sprehe's opinion as to a pre-existing 60% "intellectual handicap." The deputy's acceptance of that evidence therefore does not support the equivalent or pro tanto diminution of the permanent total disability award because the degree of impairment is only one element of proof underlying such an award, and the rated impairment has no arithmetical relation to the degree of disability as that term is defined in our statute.
482 So.2d at 473. It was then held that the record failed to contain competent substantial evidence to show "what part, if any, of claimant's PTD was caused by the pre-existing 60% intellectual impairment." Id. at 473-74. The court distinguished Goldsmith I with the following comments:
Because the order there reviewed did not make any "award for permanent impairment," being instead an award for permanent total disability based in part on impairment, the concluding language may most reasonably be read as requiring apportionment of that part of the PTD award which, on remand, might be found attributable to pre-existing impairment. We are unable on the basis of the opinion to determine what method of attribution was intended, and we note that the order entered on remand is now pending review here. Other than that ambiguous directive we are referred to no logic or authority for subtracting a noncompensable impairment percentage directly from a PTD award. There is, of course, support in both reason and law for the principle that a noncompensable pre-existing impairment supports apportionment only to the extent that it independently contributes to an award of compensation.
Id. at 474. The Lemus decision assumed, without deciding the question, that permanent total disability benefits could still be apportioned under the statutory provisions, and it found no indication in the statutory language of legislative intent to alter the principles established in Evans. It applied the rationale of Evans in concluding that the deputy erred in apportioning out of the permanent total disability award a direct percentage of the "impairment" percentage rating. To this extent, therefore, there is an apparent inconsistency between Goldsmith I and Lemus.
The statutory terms "permanent impairment" and "disability" are conceptually different in meaning and application. Prior to and after 1979 the term "disability" has been consistently defined as "incapacity because of the injury to earn in the same or any other employment the wages which the employee was receiving at the time of the injury." § 440.02(9), Fla. Stat. (1981). For many years permanent disability, under the act, has consistently meant the extent to which a permanent physical impairment of body functions, whether partial or total, due to injuries suffered in an industrial accident, has rendered a claimant unable to earn wages at the level earned before the accident. The extent of disability has consistently been held a question of fact for decision by the deputy based on consideration *632 of many interrelating factors, including, but not limited to, the extent of such physical impairment.
The term "permanent impairment" in the 1979 amendments to the act was defined to mean "any anatomic or functional abnormality or loss, existing after the date of maximum medical improvement, which results from the injury." § 440.02(21), Fla. Stat. (1981).[5] It is customarily a percentage rating assessed as a measure of the degree of loss of use of a limb or bodily function determined through physical examination by a qualified physician, and may be limited to a specific limb or function or cover the body as a whole. The rating is required to be based upon a schedule adopted by the Division of Workers' Compensation "for determining the existence and degree of permanent impairment based upon medically or scientifically demonstrable findings" which, in turn, "shall be based on generally accepted medical standards for determining impairment." § 440.15(3)(a), Fla. Stat. (1981). The term "permanent impairment" is used in several different sections of chapter 440 in contexts which clearly illustrate that the statutorily defined concept of "permanent impairment" is quite different from the concept of "disability."
The term "permanent impairment" is used in several portions of section 440.15, entitled "Compensation for disability." It appears in the provision for specified "impairment benefits" under section 440.15(3)(a), i.e., "amputation, loss of 80 percent or more of vision, after correction, or serious facial or head disfigurement resulting from an injury other than an injury entitling the injured worker to permanent total disability benefits pursuant to subsection (1)." Significantly, these specified permanent impairment benefits are not payable if the injured worker is also entitled to permanent total disability under subsection 440.15(3)(a)1. "Permanent impairment" is similarly used in section 440.15(5)(b) dealing with compensable permanent impairment benefits under section 440.15(3)(a) due to aggravation or acceleration of a preexisting condition.[6] The term is also used in defining the right to "wage-loss benefits" under section 440.15(3)(b). But there is no language directly relating a "permanent impairment" rating to either permanent total disability benefits under section 440.15(1) or to temporary total disability benefits under section 440.15(2). "Total disability" is defined in section 440.15(1)(b) strictly in terms of the facts and the inability of the claimant to engage in gainful employment, irrespective of the percentage rating of permanent impairment. In short, nothing in the statutory language in section 440.15 indicates that "permanent impairment" is intended to include "permanent, total loss of wage earning capacity" in the sense of permanent total disability, as stated in Goldsmith I, 465 So 2d at 658.
*633 The context and use of "permanent impairment" in other portions of chapter 440 likewise confirms our conclusion that "permanent impairment," being a term of art limited to anatomic or functional abnormality or loss as established and rated by a testifying physician, is not the conceptual equivalent of a claimant's "disability" to earn wages or income at the level he or she was earning at the time of the industrial accident.
Section 440.25(3)(b) specifies that "[n]o deputy commissioner shall make a finding of a degree of permanent impairment that is greater than the greatest permanent impairment rating given the claimant by any examining or treating physician, except upon stipulation of the parties." This subsection, read in pari materia with section 440.15(3)(a), makes plain that findings of permanent impairment ratings must be based on and not exceed the rating given by a physician. This notion contrasts sharply with the deputy commissioner's duty to make findings of fact based on many factors, including permanent impairment, in determining the extent of disability to earn income. E.g., Lemus v. Industrial Sites Services, 482 So.2d 472 (see p. 630, supra).
Section 440.20(3) specifies that "[i]mpairment benefits shall be payable in accordance with s. 440.15(3)(a)2," which provides for listed impairment benefits. Section 440.20(7) refers, in the alternative, to installments of "compensation for death or dependency benefits, disability, permanent impairment, or wage loss" (emphasis added). Section 440.20(13)(c), dealing with advance payments, authorizes small payments under certain conditions "[i]n the event the claimant has not returned to the same or equivalent employment with no substantial reduction in wages or has suffered a substantial loss of earning capacity or a physical impairment" (emphasis added). Subsection 440.34(3)(a), dealing with claimant's right to recover attorney's fees, refers alternatively to a "claim for disability, permanent impairment, wage loss, or death benefits" as separate and distinct claims. Each of these subsections uses the term "permanent impairment" in a sense quite different from the long-standing definition of disability, and the repeated alternative references to disability, permanent impairment, or wage loss connotes a legislative intention to differentiate between each of these concepts as a basis for awarding benefits.
Perhaps most illustrative of the conceptual differences between the terms "permanent impairment" and "disability" is section 440.49(2), relating to the limitation of liability of the Special Disability Trust Fund for subsequent injury. Subsection 440.49(2)(a) expresses the legislative intent:
[T]o encourage the employment of the physically handicapped by protecting employers from excess liability for compensation and medical expense when an injury to a handicapped worker merges with his preexisting permanent physical impairment[7] to cause a greater disability, permanent impairment, or wage loss than would have resulted from the injury alone.
(Emphasis added.) The term "merger" is defined in subsection 440.49(2)(b)2 b to mean:
The permanent disability, permanent impairment, or wage loss resulting from the subsequent accident or occupational disease is materially and substantially greater than that which would have resulted had the permanent physical impairment not existed and the employer has been required to pay, and has paid, permanent total disability, permanent impairment, or wage-loss benefits for that materially and substantially greater disability.
Subsection 440.49(2)(b)3 similarly provides:
"Excess permanent compensation" means that compensation for permanent impairment, wage-loss benefits, or permanent total disability or death benefits for which the employer or carrier is *634 otherwise entitled to reimbursement from the Special Disability Trust Fund.
(Emphasis added.) Finally, subsection 440.49(2)(c) explains in detail, in separate paragraphs, the impact of the limitations in this section on "permanent impairment," "wage loss," and "permanent total disability." Subsection 440.49(2)(c)1 provides that in the event an employee with a preexisting permanent physical impairment suffers a subsequent "permanent impairment" which merges with the preexisting condition so as to cause a "permanent impairment," the employer may be reimbursed for sixty percent of the benefits paid under subsection 440.15(3)(a), the section that provides for specified permanent impairment benefits.[8] Subsection 440.49(2)(c)2 makes similar provision for reimbursement of "wage loss benefits" paid pursuant to subsection 440.15(3)(b).[9] Subsection 440.49(2)(c)3 makes provision for reimbursement to the employer of "permanent total disability" benefits in excess of the first one hundred seventy-five weeks of permanent total disability compensation where a merger between a preexisting permanent physical impairment and permanent total disability occurs.[10]
It is readily apparent that throughout chapter 440 the term "permanent impairment" has been consistently used in the sense of a percentage rating assessed by a physician for the anatomical or functional loss of the body or limbs, either in relation to the permanent impairment benefits provided in subsection 440.15(3)(a) or for wage-loss benefits as defined in subsection 440.15(3)(b). At no place is the percentage rating for permanent impairment required to be used directly in assessing either wage loss or temporary and permanent total disability; the fact that any degree of permanent impairment exists is sufficient. On the other hand, all references to disability connote an inability to earn wages in the manner or at the level the claimant was able to earn before the injury in a compensable accident. There is, therefore, no basis for construing the statutory provisions, expressly or by implication, as directly equating permanent impairment to permanent total disability due to a permanent loss of wage-earning capacity, as we did in Goldsmith I. To this extent, therefore, we recede from Goldsmith I.
*635 Since section 440.02(18), as amended in 1980, provides that "only acceleration of death or acceleration or aggravation of the preexisting condition reasonably attributable to the accident shall be compensable, with respect to death or permanent impairment," and does not contain any reference to "disability," as did the statute construed in Evans, does this mean that acceleration or aggravation of the preexisting condition and the effect thereof on disability is not compensable or apportionable under the rationale of the Evans decision? We think not. For the following reasons, we hold that PTD remains apportionable if the disability falls into the third category described in Evans (see p. 628, supra). As stated, permanent total disability is defined in section 440.15(1) in terms of total permanent inability, based on the facts, to engage in gainful employment. The fact of "permanent impairment" must be considered along with all other factors shown by the evidence in determining permanent total disability. Lemus v. Industrial Sites Services, 482 So.2d 472. Subsection 440.15(5)(a) plainly states that "[t]he fact that an employee has suffered previous disability, impairment, anomaly, or disease, or received compensation therefor, shall not preclude him from benefits for a subsequent injury nor preclude benefits for death resulting therefrom." As we read this plain language, it means that an employee who has been suffering from a prior condition (such as preexisting osteoarthritis) which has not disabled him from performing gainful employment may recover benefits for a subsequent injury due to a compensable accident despite the presence of such preexisting condition. As stated in Goldsmith I, since only compensation for "temporary disability, medical benefits, and wage-loss benefits" are expressly exempted from apportionment by subsection 440.15(5)(a), the failure to include permanent total disability in the enumeration of nonapportionable benefits indicates that PTD benefits remain apportionable only if the conditions set forth in Evans are met. Whether permanent total disability due in part to a preexisting condition meets the requirements in Evans and must be apportioned is a factual issue to be decided by the deputy.
We look now to record and the facts as found by the deputy in the appealed order and the prior order of March 1984 to determine what action is appropriate for the disposition of this case. We note that on the prior appeal the employer and carrier conceded that "the record contains no evidence that Goldsmith was suffering from disability either at the time of the accident or at the time of the hearing." Goldsmith I, 465 So.2d at 656. We take this concession to mean that Goldsmith was suffering no disability attributable to the preexisting condition that was independent of the accelerating or aggravating effect of the September 1981 accident. Otherwise the statement makes no sense. The employer and carrier argue only that as a result of the statutory changes since 1979 the PTD award must be directly reduced by the permanent impairment percentage rating. There is no contention by the employer and carrier that the preexisting condition either "(1) was disabling at the time of the accident [in the gainful employment sense] and continued to be so at the time the award is made or (2) was producing no disability [in the gainful employment sense] at the time of the accident but through its normal progress is doing so at the time permanent disability is determined and an award is made." Evans v. Florida Industrial Comm'n, 196 So.2d at 752-53. The employer and carrier's concession is supported by the record and the deputy's findings. The evidence does not support a finding that the preexisting condition is, independent of the aggravation caused by the compensable accident, disabling the claimant from engaging in gainful employment. Therefore, even though the preexisting condition was causing some permanent impairment, as measured by the physician, such permanent impairment was not contributing to Goldsmith's permanent total disability so as to form a basis for apportionment. Holloway v. Curcie Brothers, Inc., 203 So.2d 499 (Fla. 1967). *636 Unlike the Holloway case, however, the employer and carrier in this case had ample "opportunity for a showing of permanent disability due to the normal progress of the pre-existing disease" at the time of the deputy's hearing (203 So.2d at 502), and failed to do so. Hence, we need not remand for the taking of further evidence.
In summary, we hold that permanent total disability benefits remain subject to apportionment consistent with the statutory construction and principles enunciated in the Evans decision. We further hold that Goldsmith's permanent total disability is not subject to apportionment because his permanent impairment due to the preexisting condition has not been shown to be disabling within the meaning of the third category described in that case. The appealed order is reversed, and this action is remanded to the deputy commissioner with directions to enter an order awarding full PTD benefits to claimant without reduction on account of apportionment.
REVERSED and REMANDED.
BOOTH, C.J., and MILLS, ERVIN, SMITH, SHIVERS, WENTWORTH, JOANOS, THOMPSON, WIGGINTON, NIMMONS and BARFIELD, JJ., concur.
NOTES
[1] Based on this date of accident, all references in this opinion to chapter 440, Florida Statutes, will be to the 1981 edition unless otherwise indicated.
[2] That section then read in part: "Where a preexisting disease is accelerated or aggravated by accident arising out of and in the course of the employment, only acceleration of death or the acceleration or aggravation of disability reasonably attributable to the accident shall be compensable." § 440.02(19), Fla. Stat. (1961).
[3] That section then read in part:

The fact that an employee has suffered previous disability or received compensation therefor shall not preclude him from benefits for a later injury nor preclude benefits for death resulting therefrom; but in determining compensation for the later injury or death his average weekly wages shall be such sum as will represent his earning capacity at the time of the later injury; provided, however, that an employee who is suffering from a previous disability shall not receive compensation for a later injury in excess of the compensation allowed for such injury when considered by itself and not in conjunction with the previous disability except as hereinafter provided in paragraph (d) of this subsection.
§ 440.15(5)(c), Fla. Stat. (1961).
[4] Section 440.02(18), Florida Statutes (1979) specifically states: "Where a preexisting disease or anomaly is accelerated or aggravated by an accident arising out of, and in the course of, employment and resulting in death, only acceleration of death reasonably attributable to the accident shall be compensable."
[5] This term is not to be confused with the concept of "permanent physical impairment," defined for purposes of the Special Disability Trust Fund provisions in section 440.49(2)(b)1 (both before and after 1979) to mean "any permanent condition due to previous accident or disease or any congenital condition which is, or is likely to be, a hindrance or obstacle to employment, but not due to the natural aging process."
[6] Section 440.15(5)(b) states:

If a compensable permanent impairment, or any portion thereof, is a result of aggravation or acceleration of a preexisting condition, or is the result of merger with a preexisting impairment, an employee eligible to receive impairment benefits under paragraph (3)(a) shall receive such benefits for the total impairment found to result, excluding the degree of impairment existing at the time of the subject accident or injury or which would have existed by the time of the impairment rating without the intervention of the compensable accident or injury. The degree of permanent impairment attributable to the accident or injury shall be compensated in accordance with paragraph (3)(a). As used in this paragraph, "merger" means the combining of a preexisting permanent impairment with a subsequent compensable permanent impairment which, when the effects of both are considered together, result in a permanent impairment rating which is greater than the sum of the two permanent impairment ratings when each impairment is considered individually.
[7] The definition of this term is set forth in footnote 5, supra.
[8] Subsection 440.49(2)(c)1 states:

If an employee who has a preexisting permanent physical impairment incurs a subsequent permanent impairment from injury or occupational disease arising out of, and in the course of, his employment which merges with the preexisting permanent physical impairment to cause a permanent impairment, the employer shall, in the first instance, pay all benefits provided by this chapter, but, subject to the limitations specified in paragraph (f), such employer shall be reimbursed from the Special Disability Trust Fund created by paragraph (h) for 60 percent of all impairment benefits which the employer has been required to provide pursuant to s. 440.15(3)(a) as a result of the subsequent accident or occupational disease.
[9] Subsection 440.49(2)(c)2 states:

If an employee who has a preexisting permanent physical impairment incurs a subsequent permanent impairment from injury or occupational disease arising out of, and in the course of, his employment which merges with the preexisting permanent physical impairment to cause a wage loss, the employer shall, in the first instance, pay all benefits provided by this chapter, but, subject to the limitations specified in paragraph (f), such employer shall be reimbursed from the Special Disability Trust Fund created by paragraph (h) for 60 percent of all compensation for wage loss which the employer has been required to provide pursuant to s. 440.15(3)(b) during the first 5 years after the date of maximum medical improvement and for 75 percent of all compensation for wage loss which the employer has been required to provide after the 5-year period following the date of maximum medical improvement.
[10] Subsection 440.49(2)(c)3 states:

If any employee who has a preexisting permanent physical impairment incurs a subsequent permanent impairment from injury or occupational disease arising out of, and in the course of, his employment which merges with the preexisting permanent physical impairment to cause permanent total disability, the employer shall, in the first instance, pay all benefits provided by this chapter, but, subject to the limitations specified in paragraph (f), such employer shall be reimbursed from the Special Disability Trust Fund created by paragraph (h) for all compensation for permanent total disability which is in excess of the first 175 weeks of permanent total disability compensation.