Larry BEARCE, Appellant,

v.

FMC CORPORATION, Appellee.

No. 89–1423.

Supreme Court of Iowa.

Jan. 23, 1991.

Rehearing Denied Feb. 20, 1991.

Thomas M. Wertz of Mollman & Wertz, Cedar Rapids, for appellant.

James E. Shipman and James M. Peters of Simmons, Perrine, Albright & Ellwood, Cedar Rapids, for appellee.

Considered by SCHULTZ, P.J., and LAVORATO, NEUMAN, SNELL, and ANDREASEN, JJ.

LAVORATO, Justice.

In 1984 Larry Bearce, the claimant, suffered a work-related injury. The industrial commissioner determined ·that Bearce had an industrial disability of twenty-five percent from a 1977 automobile accident. The commissioner also determined that Bearce's 1984 work injury gave him an additional industrial disability of ten percent. On judicial review the district court affirmed the commissioner's decision.

The court of appeals reversed. The court concluded that (1) there was no apportionable industrial disability before the 1984 work-related accident and (2) the claimant's entire thirty-five percent disability should therefore be attributed to the work-related accident.

On further review, we affirm the decision of the court of appeals and reverse the judgment of the district court as to apportionment.

Bearce began his employment with FMC Corporation in Cedar Rapids in 1968. He was a janitor first, then became an overhead crane operator, and eventually

worked in the machine shop operating drills and lathes. Most of his jobs involved at least some repetitive heavy lifting, bending, twisting, stooping, and prolonged standing.

In December 1977 Bearce hurt his back in a nonwork-related automobile accident. This accident coincided with the beginning of Bearce's medical history of lower back pain.

Following the automobile accident, Bearce experienced lower back pain which caused him to miss a considerable amount of work in 1978 and 1979. In December 1979 Bearce was referred to the Sister Kenny Institute in Minnesota where he was treated and thereafter released.

Bearce returned to the Institute in May 1980 because of continued back pain. That month Dr. Alexander Lifson, an orthopedic surgeon, operated on Bearce's lower back. The doctor performed a decompression laminotomy. Bearce experienced about two months of relief from this procedure.

In January 1981 Bearce was admitted to the Chronic Pain Rehabilitation Program at the Institute. An orthopedic evaluation at that time resulted in a good overall prognosis. Bearce underwent physical and occupational therapy with good results.

On March 3, 1981, Dr. Lifson prepared a functional capacities evaluation report regarding Bearce. The report indicates that Bearce's physical activities should be restricted to occasional bending, squatting, crawling, climbing, reaching above the shoulder, crouching, and kneeling. The report also states that Bearce should never lift or carry over twenty-four pounds. In the report Lifson assigns a twenty percent disability to Bearce's back.

Between 1977 and 1981 Bearce worked seven months in three different intervals as a radial drill operator. In March 1981, following his release from the pain program, Bearce returned to work as an overhead crane operator at a different FMC plant. He continued this employment until he was laid off in June 1982. Bearce was laid off because of his lifting restrictions.

The overhead crane operator position was the only job Bearce could handle in which he had recall rights. He was not recalled to that position because FMC terminated all crane operator jobs.

In November 1983 Bearce returned to work—this time as a radial drill operator. At the arbitration hearing on his workers' compensation claim, Bearce testified how he was able to go back to work:

Q. Okay. At some point you do return to FMC; is that correct? A. Yes.

Q. And in what capacity did you return? A. I returned as a [radial] drill operator.

Q. And when was that? A. I believe that was either the end of November or the first part of December of 1983.

Q. All right. You previously said that the only thing you had seniority for was an overhead crane operator because of a weight restriction, lifting restriction? A. Right. That's the only job I could return to.

. . . .

Q. What allowed you to return at that time? A. I had built up my physical condition to the point where I didn't think I had any restrictions, so I went and talked with my doctor. And he agreed with me, so he took all lifting restrictions off.

Q. So then that opened up your opportunities to get back to work? A. Right.

As Bearce testified, on November 14, 1983, Dr. John K. Meyer released the prior weight lifting restrictions in the following manner:

To Whom It May Concern:

Larry Bearce was examined today. I have advised him that all previous weight lifting restrictions have been discontinued. His activities are at his discretion.

Bearce continued to work as a radial drill operator for eleven months until his work accident on August 31, 1984. On that day he tripped on a pallet while maneuvering a 600–900 pound drum with a portable overhead crane. He again sustained injuries to

his lower back. At the time of the injury Bearce was earning $12 an hour.

At the arbitration hearing, Bearce described how he performed on the job during the eleven month period before his injury:

Q. ... Just, you know, you'd worked approximately what—it would be seven months up until this incident? A. I think it was eleven.

Q. Eleven months? All right. How did you feel through the course of your employment through those eleven months? A. I had no problems.

Q. All right. Did you go to work every day? A. Yeah.

Q. Did you have any back problems? A. No.

Q. Were there any complaints about your job performance? A. None that I ever heard.

Q. As a radial drill operator, just, you know, this time period before August 31, '84, did you have quotas? A. Oh, yes.

Q. Were you able to meet those quotas? A. If it was physically possible, yes.

Q. And when you say physically possible, what are you saying? A. Well, if there's a job that takes a half an hour to do and the company says do it in ten minutes, it's not physically possible to do it.

Q. But you're not saying it was because you were having physical problems? A. No, any job that it was humanly possible to meet the quota on, I could meet.

Bearce saw a series of doctors after this accident including Dr. Lifson. In July 1985 Dr. Lifson assigned Bearce a twenty percent permanent partial disability to the lumbar spine. Dr. Lifson attributed five percent of this disability to the work injury Bearce suffered on August 31, 1984.

Eventually Bearce underwent a second surgery on his lower back in August 1985. Dr. John Walker, an orthopedic surgeon, excised the fourth and fifth lumbar disc and fused the lower back. In February 1986 Dr. Walker assigned Bearce a twenty-five percent permanent, partial disability of the body as a whole of which ten percent, he opined, preexisted the work injury of August 1984.

All the doctors agreed that Bearce should be restricted to light duty work. FMC terminated Bearce's employment in October 1984. Bearce was then awarded social security disability benefits.

At the arbitration hearing Bearce described his pain and disability. He is never totally free from pain. He has difficulty standing for prolonged periods of time because of hip and lower back pain. He can comfortably sit for only twenty to thirty minutes and experiences leg pain while sitting. He cannot lift over twenty pounds without experiencing significant pain. Upon advice of his doctor, he does not bend, stoop, or twist.

Following the arbitration hearing, a deputy industrial commissioner found that on August 31, 1984, Bearce suffered a work injury to the lower back in the form of an aggravation of a preexisting condition. The deputy concluded that the work injury was a cause of a significant permanent partial impairment to the body as a whole. The deputy further concluded that this impairment covered only a ten percent loss of earning capacity and that a much larger loss of earning capacity had been caused by the 1977 automobile accident.

The deputy awarded Bearce fifty weeks of permanent partial disability benefits. The deputy also awarded Bearce healing period benefits from October 15, 1984, through October 22, 1986. The healing period benefits were based on a finding that Bearce had reached maximum healing on October 22, 1986.

Bearce appealed to the industrial commissioner, raising three issues. See Iowa Code § 86.24 (1985). First, the deputy had erred in reducing Bearce's industrial disability by apportioning a part of such disability to a preexisting condition. Second, the deputy erred in concluding Bearce had suffered an industrial disability of only ten percent. Last, the deputy erred by not considering Bearce an odd lot employee.

FMC cross-appealed, challenging the award of healing period benefits.

The industrial commissioner determined that following the August 1984 work injury Bearce had an industrial disability of thirty-five percent. The commissioner also determined that before this injury Bearce had an industrial disability of twenty-five percent. The commissioner concluded that as a result of the August 1984 work injury, Bearce had an industrial disability of ten percent. In effect the commissioner apportioned twenty-five percent of the total industrial disability to the 1977 automobile accident. The commissioner also concluded that Bearce was not an odd lot employee and that his healing period ended October 22, 1986.

Bearce filed a petition for judicial review of the commissioner's decision. *See* Iowa Code § 17A.19. FMC filed a cross-petition. The district court upheld the commissioner's decision.

Bearce appealed and FMC cross-appealed. We transferred the case to the court of appeals. *See* Iowa R.App.P. 401.

The court of appeals reversed the district court's ruling in part. The court of appeals held that the evidence did not support that part of the commissioner's decision which apportioned the total industrial disability. The court concluded as a matter of law that the entire thirty-five percent industrial disability should be attributed to the work-related accident.

In addition, the court of appeals affirmed the award of healing period benefits.

FMC sought further review to challenge the court of appeals' partial reversal. *See* Iowa R.App.P. 402. We granted FMC's petition for further review.

On further review FMC contends there was substantial evidence to support the commissioner's conclusion that Bearce had a twenty-five percent industrial disability which preexisted the 1984 work-related injury. Given such evidence, FMC argues that the court of appeals should not have determined as a matter of law that all of the thirty-five percent industrial disability was attributable to the 1984 injury. FMC

does not challenge that portion of the court of appeals' decision which upheld the award of healing period benefits.

I. The Iowa Administrative Procedure Act, chapter 17A of the Iowa Code, governs judicial review of decisions rendered by the industrial commissioner. *See* Iowa Code § 86.26. Iowa Code section 17A.19 authorizes the district court to review such decisions. In exercising this authority the district court acts in an appellate capacity to correct errors of law on the part of the agency. *Norland v. Iowa Dep't of Job Serv.*, 412 N.W.2d 904, 908 (Iowa 1987).

When this court reviews a district court decision on the validity of an agency action, we ask only whether the district court has correctly applied the law. In our review of the district court decision, we merely apply the standards of section 17A.19(8) to the agency action to determine whether our conclusions are the same as those of the district court. When the conclusions are the same, we must affirm. If, however, we disagree with the district court's conclusion, we must reverse. *See id.*

Under the substantial evidence rule of section 17A.19(8)(f), we determine whether there is substantial evidence in the record as a whole to support the decision of the agency. If so, we affirm; otherwise, we reverse. *See Downing v. Iowa Dep't of Transp.*, 415 N.W.2d 625, 627 (Iowa 1987). In other words, we are bound by fact findings of an agency when they are supported by substantial evidence. Evidence is not unsubstantial merely because it would have supported contrary inferences. Evidence is substantial when a reasonable mind could accept it as adequate to reach the same finding. *Norland*, 412 N.W.2d at 913.

On the other hand, when the relevant evidence is uncontroverted and reasonable minds could not draw different inferences from the evidence, we can on review determine the facts as a matter of law. *Armstrong v. State of Iowa Bldgs. & Grounds*, 382 N.W.2d 161, 165 (Iowa 1986).

II. At the heart of this controversy is whether the commissioner should have apportioned the industrial disability be-

tween the 1984 work-related injury and the 1977 automobile accident. We have made it clear that apportionment is

> [limited] to those situations where a prior injury or illness, unrelated to the employment, independently produces some ascertainable portion of the ultimate industrial disability which exists following the employment related aggravation.

*Varied Enters., Inc. v. Sumner*, 353 N.W.2d 407, 411 (Iowa 1984) (relying on apportionment principle as stated in 2 A. Larson, *The Law of Workmen's Compensation* § 59.22, at 10–365 (1981)); *accord Tussing v. George A. Hormel & Co.*, 461 N.W.2d 450, 453 (Iowa 1990). As Larson puts it:

> Nothing is better established in compensation law than the rule that, when industrial injury precipitates disability from a latent prior condition, such as heart disease, cancer, back weakness and the like, the entire disability is compensable, and except in states having special statutes on aggravation of disease, no attempt is made to weigh the relative contribution of the accident and the preexisting condition to the final disability or death. Apportionment does not apply in such cases, *nor in any case in which the prior condition was not a disability in the compensation sense.*

2 A. Larson, *The Law of Workmen's Compensation*, § 59.22(a), at 10–371–76 (1989) (emphasis added).

When a claimant's injuries consist of general bodily injuries, the industrial commissioner must compute and fix the percentage of disability. The disability should be evaluated from an industrial standpoint. The functional disability is but one of a number of factors the commission must consider in determining industrial disability. *Martin v. Skelly Oil Co.*, 252 Iowa 128, 133, 106 N.W.2d 95, 98 (1960).

We have spelled out the difference between functional and industrial disability:

> The two methods used to evaluate a disability, functional and industrial, are dissimilar. Functional disability is assessed solely by determining the impairment of the body function of the employee; industrial disability is gauged by determining the loss to the employee's earning capacity. Functional disability is limited to the loss of physiological capacity of the body or body part. Industrial disability is not bound to the organ or body incapacity, but measures the extent to which the injury impairs the employee in the ability to earn wages. Criteria for the test of industrial disability include the extent of functional disability, along with the employee's age, education, qualification, experiences, and the injury-induced inability of the employee to engage in employment for which the employee is fitted.

*Simbro v. Delong's Sportswear*, 332 N.W.2d 886, 887 (Iowa 1983).

The following helpful definitions of impairment and disability underscore the difference between functional disability or impairment and industrial disability:

> [I]mpairment means an alteration of an individual's health status that is assessed by medical means; "disability," which is assessed by nonmedical means, means an alteration of an individual's capacity to meet personal, social, or occupational demands, or to meet statutory or regulatory requirements. Simply stated, "impairment" is what is wrong with the health of an individual; "disability" is the gap between what the individual can do and what the individual needs or wants to do.

American Medical Association, *Guides to the Evaluation of a Permanent Impairment* 2 (3d ed. 1988). The distinction between functional disability or impairment and industrial disability is critical in understanding Larson's statement that apportionment does not apply to a "prior condition [which] was not a disability in the compensation sense." By this statement Larson means apportionment is not applied to an impairment that prior to the accident had no effect on the employee's ability to earn wages. Simply put, the "disability" Larson is talking about is industrial disability and not simply functional disability.

Other courts have similarly interpreted the apportionment rule, absent a special

statute on apportionment. *See, e.g., Wilson Hargett Constr. Co. v. Holmes*, 235 Ark. 698, 699–702, 361 S.W.2d 634, 635–37 (1962) (no apportionment of disability from 1960 heart attack to 1957 heart attack where claimant returned to full-time employment, earning full-time wages after first heart attack) (citing Larson and concluding apportionment did not apply because first heart attack resulted in no earning capacity reduction); *Craighead Memorial Hosp. v. Honeycutt*, 5 Ark.App. 90, 90–2, 633 S.W.2d 53, 53–54 (1982) (no apportionment of disability from 1978 back injury to 1974 back injury where claimant returned to full-time employment, earning full-time wages after first back injury) (though 12.5% of 30% functional disability was attributed to first back injury, court found first injury did not independently cause industrial disability prior to second injury); *Wadleigh v. Higgins*, 358 A.2d 531 (Me.1976) (nondisabling physical infirmities, including carcinoma of larynx, gout, and osteoarthritis of spine did not warrant apportionment of work-related disability) (citing Larson); *Carbonaro v. Chinatown Sea Food, Inc.*, 55 A.D.2d 756, 389 N.Y. S.2d 640 (1976) (no apportionment of disability from 1971 back injury requiring surgery to 1947 back injury also requiring surgery where claimant returned to full-time employment with no industrial disability following first back injury) (citing Larson).

In those states in which the apportionment rule has been codified, courts have strived to interpret these statutes to similarly limit the apportionment rule. *See, e.g., Kroger Co. v. Millsap*, 280 Ala. 531, 196 So.2d 380 (1967); *State Compensation Fund v. Harris*, 26 Ariz.App. 9, 545 P.2d 971 (1976); *Zemke v. Workmen's Compensation Appeals Bd.*, 68 Cal.2d 794, 441 P.2d 928, 69 Cal.Rptr. 88 (1968) (no substantial evidence to support apportionment of industrial disability to a preexisting asymptomatic arthritic condition); *Escambia City Council on Aging v. Goldsmith*, 500 So.2d 626 (Fla.Dist.Ct.App.1986); *Bethlehem Steel Corp. v. Cummings*, 160 Ind. App. 160, 310 N.E.2d 565 (1974).

■ There are several sound reasons for limiting apportionment to preexisting conditions or prior injuries that are disabling in the compensation sense. First, apportionment must be considered in light of the rule that employers take employees as they find them at the time of employment. In other words, when employees are hired, employers take them subject to any active or dormant health impairments incurred prior to employment. *Zeigler v. United States Gypsum Co.*, 252 Iowa 613, 620, 106 N.W.2d 591, 595 (1960). So if a subsequent injury aggravates a preexisting condition rendering the condition disabling, the employer is liable for the disability. *Rose v. John Deere Ottumwa Works*, 247 Iowa 900, 908, 76 N.W.2d 756, 760–61 (1956); *cf. Zemke*, 68 Cal.2d at 796, 441 P.2d at 929, 69 Cal.Rptr. at 89 (interpreting apportionment statute in light of rule that employers take employees as they find them). Apportioning industrial disability to a preexisting condition or prior injury that had no effect on the injured employee's earning capacity would fly in the face of this rule.

Second, such an apportionment runs counter to the fundamental rule that we construe the Workers' Compensation Act liberally in favor of the injured employee. *Teel v. McCord*, 394 N.W.2d 405, 407 (Iowa 1986). This clash results because the injured employee faces the possibility of bearing a substantial part of the final loss caused by the latest work injury.

Last, apportionment in workers' compensation law is based on fairness: an employer should not be responsible for an industrial disability the employer did not cause. If there is no such disability from a preexisting condition or prior injury, there is no good reason to apply the apportionment rule.

Here Bearce returned to full-time employment, earning full-time wages in November 1983 without any physical restrictions. He was able to do so because he had built up his physical condition.

For the next eleven months Bearce did all that was expected of him in the radial drill operator's job, a job that required considerable physical exertion. During this

period Bearce sought no medical attention, met all work quotas, lost no work, and suffered no drop in pay. In addition there is no record evidence that Bearce had sought any medical attention for his lower back for two and one-half years before his August 1984 injury. In short, there is no record evidence that during this eleven month period Bearce was suffering from any disability affecting his earning capacity. *See Diederich v. Tri–City Ry. Co.,* 219 Iowa 587, 594, 258 N.W. 899, 902 (1935) (industrial disability is the inability on the part of the injured employee to carry on the work the employee was doing before the injury, or any work which the employee could perform).

The extent of industrial disability is a question of fact for the industrial commissioner. As we said, such a determination is based on several factors including, but not limited to, the extent of functional disability or impairment. Here there is no substantial evidence to support a finding that the 1977 injury was in any way disabling to Bearce in his employment as a radial drill operator at the time of the second injury. More specifically, there is no substantial evidence to support a finding that the prior injury independently produced some ascertainable portion of the industrial disability which existed following the 1984 injury. In fact we fail to see where the commissioner even made such a finding. Without such evidence, the district court erroneously concluded that the commissioner was correct in applying the apportionment rule.

Apparently the commissioner accepted Dr. Walker's opinion that Bearce had suffered a twenty-five percent disability or impairment from the 1977 injury and equated this to a twenty-five percent industrial disability. The problem with this approach is that no substantial record evidence exists to support a finding that any prior impairment was independently affecting Bearce's earning capacity at the time of the second injury. *Cf. Diederich,* 219 Iowa at 593, 258 N.W. at 902 (commissioner erred when he equated industrial disability with functional disability). So the commissioner erred when he applied the apportionment rule.

 III. There is substantial evidence to support the commissioner's finding that Bearce had suffered a thirty-five percent industrial disability following the 1984 work-related injury. But as we said, the apportionment rule should not have been applied. So like the court of appeals we hold as a matter of law that all of the thirty-five percent industrial disability is attributable to the 1984 work-related injury.

The decision of the court of appeals is affirmed. The judgment of the district court as to apportionment is reversed. We remand to the commissioner for an order awarding Bearce benefits based on a permanent partial disability of thirty-five percent of the body as a whole.

DECISION OF COURT OF APPEALS AFFIRMED; JUDGMENT OF THE DISTRICT COURT REVERSED IN PART.