LAUHOFF GRAIN COMPANY and
Aetna Insurance, Appellants,

v.

Ted M. McINTOSH, Appellee.

No. 85–434.

Supreme Court of Iowa.

Nov. 12, 1986.

Philip Willson of Smith, Peterson, Beckman & Willson, Council Bluffs, for appellants.

Thomas L. Root of Pogge, Root & Fleming, Council Bluffs, for appellee.

LARSON, Justice.

Ted McIntosh, an employee of Lauhoff Grain Company, fell on the job, fracturing the "neck" of his femur at a point just below the hip joint. The fracture was treated, but complications later developed, making it necessary to install a prosthetic hip joint. In the workers' compensation proceedings which followed, the key issue was whether McIntosh was entitled to benefits for a "scheduled" injury to his leg, Iowa Code § 85.34(2)(o) (1977), or industrial disability benefits under Iowa Code section 85.34(2)(u) on the basis the hip surgery had extended his disability to the body as a whole.

The industrial commissioner awarded benefits on the basis of industrial disability. The employer, and its insurance carrier (who we will refer to collectively as Lauhoff), challenged the award on judicial review. The district court and the court of appeals affirmed. We granted further review. We now vacate the court of appeals opinion, affirming the district court in part and reversing in part, remanding for further proceedings.

The facts surrounding McIntosh's injury are not disputed. He fell approximately seven feet from a railroad car in June, 1978. The resulting fracture was reduced, and four Knowles pins were placed across the fracture site. He progressed satisfactorily and eventually returned to work. Later, however, a complication called avascular necrosis or "deadhead" developed as a result of the interruption of the blood supply to the head of the femur.

In 1980, McIntosh underwent surgery for replacement of the hip joint. It is this surgical procedure, and its effects on the hip, which generate the issues on appeal. McIntosh claims that, while the original injury was to his leg (a "scheduled" injury), the surgical intrusion into the pelvis to install the new joint extended his impairment to the body as a whole. Lauhoff counters that it must still be considered a leg injury for workers' compensation purposes.

Our statutory "schedule" of benefits sets the amount of compensation for the loss of certain specified body members. These include eyes, ears, fingers, toes, hands, arms, feet and legs. See Iowa Code §§ 85.-34(2)(a)–(t) (1977). The schedule which is relevant here provides that "[t]he loss of two-thirds of that part of a leg between the hip joint and the knee joint shall equal the loss of a leg, and the compensation therefor shall be weekly compensation during two hundred twenty weeks." Iowa Code § 85.34(2)(o) (1977) (This section is identical in the 1985 Code.). There is no schedule of benefits for the loss of the use of a hip joint unless, as Lauhoff claims, it is considered to be a part of the leg.

Iowa Code section 85.34(2)(u) provides for benefits in cases of injuries not falling under the schedule. This section provides:

In all cases of permanent partial disability other than those hereinabove described or referred to in paragraphs "a" through "t" hereof, the compensation shall be paid during the number of weeks in relation to five hundred weeks as the disability bears to the body of the injured employee as a whole.

The disability referred to in this section is known as industrial disability, disability to the body as a whole, or simply an "unscheduled" injury. In many cases, including the present one, the disparity in benefits between the schedule and the industrial disability provision is substantial.

Lauhoff's challenge to the industrial commissioner's allowance of industrial disability is based on two grounds: First, it claims it was contrary to statute and the industrial commissioner's own rules which require a hip injury to be treated as a scheduled injury to the leg. Second, even if the hip impairment were an injury to the body as a whole, there was no finding of any impairment of function except as to the leg, and the injury must therefore be treated as a scheduled injury.

Some understanding of the anatomy of the hip joint is necessary to resolve the issues raised. Gray describes the hip joint as follows:

I. Coxal Articulation or Hip Joint

. . . .

This articulation is a ball-and-socket joint . . . formed by the reception of the head of the femur into the cup-shaped cavity of the acetabulum. The articular cartilage on the head of the femur, thicker at the center than at the circumference, covers the entire surface with the exception of the fovea capitis femoris, to which the ligamentum capitis is attached; that on the acetabulum forms an incomplete marginal ring, the lunate surface. Within the lunate surface there is a circular depression devoid of cartilage, occupied in the intact body by a mass of fat covered by synovial membrane.

H. Gray, *Anatomy of the Human Body*, at 341 (Goss ed. 1973). The angular shaft of bone at the upper end of the femur, between the main mass of the femur, and the ball of the hip socket is called the "neck" of the femur. *Id.* at 344–45. This is where McIntosh's fracture occurred.

In this case, Dr. Ronald Miller described the procedure for installing the prosthetic hip joint:

Basically, what we're doing is, this is a replica of a bone and what we're doing is, we're making a cut just right down below the round part and we make a cut here (indicating). And then we take this head out. And then we take a prosthetic device with a long stem. We ream out the center of this bone, drop it down in there and then glue it in place, using a special type of bone cement. And then essentially we end up with a device, sitting in here like this (indicating).

On the other side of the hip joint, [the socket] what we do is we have to go in and if there is any cartilage remnants left in there, we have to scrape those out. And then once we get down to bone, we use a little round device like this (indicating) with cutters on it, which looks somewhat like a cabbage grater, and it's put on a piece of power equipment, put into the acetabulum. It rotates at a high rate of speed and just grinds out a perfect half-circle, and depending upon what size cup that you want to use, we can either use a smaller or a larger or we actually have a third size—there's actually five sizes of these. We can pretty much size them to the patient. Once we have reamed this and prepared it, then we make some large and small holes in here, put some glue in here, put a cup in, hold it and then it is essentially cemented in, in about ten minutes the cement is hardened.

Despite the apparent durability of the new joint, Dr. Miller testified that McIntosh's physical activities must be curtailed to prevent a loosening of the ball or a tearing of the polyethylene lining of the hip socket. Moreover, it is possible an infection could settle in the hip joint requiring it to be removed, leaving McIntosh with no joint at all.

All of the medical experts agreed that, after the hip was replaced, McIntosh had less movement in the hip joint. A medical report introduced by Lauhoff assessed a forty percent loss of hip function. Dr. Miller assessed McIntosh's disability this way:

With respect to Ted McIntosh, we would rate this an injury to the leg. In view of the significance of the problem we would rate this as 100% disability to the leg. However, *in view of the long term problems and complications, this gentleman probably should have a permanent impairment rating to total body. Impairment should be in the range of 50 possibly 70% depending upon the results of the implant and one thing or another.* This would be either at the higher or lower number.

The "problems and complications" referred to by Dr. Miller included restricted hip movement and the necessity to avoid strenuous physical activity. He could not return to his prior job, which included considerable physical exertion such as climbing in and out of railroad cars. In emphasizing the need to exercise caution in the use of the new joint, Dr. Miller testified that his disability is

based on the fact that he does have an artificial appliance in a hip joint, the fact that he is a potential time bomb, so to speak. He may do well. He may do well for ten years. Then he may have to go back and have something done. If he starts in getting loosening and erodes a lot of his bone stock, then sometimes it's difficult to go back in and do revision arthroplasties on these people. If he gets an infection, he's wiped out. Everything comes out and he's left without a hip joint.

McIntosh and his wife also testified regarding his hip problems, including pain and extensive limitation of activity.

### I. The Statute and Administrative Rule.

A. *The statute.* The threshold issue is whether Iowa Code section 85.34(2)(*o* ) provides the exclusive remedy for a hip injury. We construed this statute in *Dailey v. Pooley Lumber Co.*, 233 Iowa 758, 10 N.W.2d 569 (1943). *Dailey*, like the present case, involved an initial injury to the neck of the femur, and later complications which caused other damage, including an injury to the hip socket. The issue was whether the impairment would be compensated as an injury to the leg or to the body as a whole. We said:

> The testimony of both Dr. Fox and Dr. McLeod is to the effect that there has been no union of a solid bony character and that there has resulted "absorption or atrophy changes in the acetabulum [hip socket] although not marked," also that there has resulted the tilting of the pelvis and compensatory curvature of the spine already mentioned. *These are injuries to parts of the body which are no part of the leg.* Dr. Fox says they are not the usual result of a fracture of the neck of the femur where union of the parts is accomplished.

*Id.* at 763, 10 N.W.2d at 572–73. We affirmed an award of benefits based on whole-body disability. *Id.* at 763–64, 10 N.W.2d at 573.

*Alm v. Morris Barick Cattle Co.*, 240 Iowa 1174, 38 N.W.2d 161 (1949), involved the analogous question of whether a shoulder injury would be treated as a scheduled injury to the arm. The language of that case, interpreting the statutory schedule for an arm injury, is persuasive in this case. We said that

> [a]ppellant [the employer] contends that where the proofs show a specific injury the award, if any, must be fixed under section 85.35 [the arm schedule] ... and that the finding of general disability and the fixing of the amount of the award under section 85.34 [total disability] were erroneous. It is urged the award should have been limited to twenty-five or thirty percent of the compensation fixed for the loss of an arm.... Appellant's contention does not take into account the hernias. *Moreover, it assumes an injury to a shoulder is an injury to an arm. This assumption is unwarranted. Subsection 13 [the arm schedule] does not apply to a shoulder injury, nor is such an injury scheduled in any other subsection of section 85.35.*

*Id.* at 1176–77, 38 N.W.2d at 163 (emphasis added).

The question of whether an injury to a joint such as a hip or shoulder should be treated as a scheduled injury or an injury to the body as a whole has been a frequent source of litigation. Professor Larson has observed, in general, that

> [t]he great majority of modern decisions agree that, if the effects of the loss of the member extend to other parts of the body and interfere with their efficiency, the schedule allowance for the lost member is not exclusive. A common example of the kind of decision is that in which an amputation of a leg causes pain shooting into the rest of the body, general debility, *stiffening of the hip socket* or other extended effects resulting in greater interference with ability to work than would be expected from a simple and uncomplicated loss of the leg. An increasingly common application of this rule involves schedule-type injuries that produce mental and nervous injury, such as traumatic neurosis; these have gener-

ally been found to call for awards going beyond the schedule.

2 A. Larson, *The Law of Workmens' Compensation* § 58.21, at 10–222 to 10–243 (1979) (emphasis added).

Courts in several other jurisdictions have addressed the question of whether injuries to hips and shoulders are to be compensated solely as injuries to the leg or arm or as disabilities to the body as a whole. Most cases have resolved the question in favor of the whole-body compensation under statutes which are very similar to ours. *See, e.g., Miller v. Industrial Commission*, 110 Ariz. 229, 517 P.2d 91 (1973) (pelvic fracture extending into hip joint; compensated as unscheduled injury); *Taylor v. Pfeiffer Plumbing & Heating Co.*, 8 Ark.App. 144, 648 S.W.2d 526 (1983) (injury to shoulder held to be unscheduled); *Jewell v. Wood*, 130 So.2d 277 (Fla.1961) (injury to shoulder with disability in arm; held to be unscheduled injury); *Liberty Mutual Insurance Co. v. Hayes*, 117 Ga.App. 500, 160 S.E.2d 902 (1968) (injury aggravated congenital defect, resulting in surgery on claimant's hip; award for general disability affirmed); *Jackson v. Stevens Well Service*, 208 Kan. 637, 493 P.2d 264 (1972) (injured hands, resulting in tendinitis in shoulder; held to be unscheduled); *Department of Mines and Minerals v. Castle*, 240 S.W.2d 44 (Ky.1951) (leg injury extending beyond leg to adversely affect ability to work proper subject of total permanent disability award); *First National Bank v. Sohn*, 35 Md.App. 44, 368 A.2d 1122 (1977) (fractured left arm and shoulder causing inflammation of sac between arm and shoulder blade; held to be unscheduled injury); *Mabry v. Tiffany Stand Co.*, 235 S.W.2d 863 (Mo.App.1951) (leg injury extended into and affecting hip held to be unscheduled); *Scamperino v. Federal Envelope Co.*, 205 Neb. 508, 288 N.W.2d 477 (1980) ("There is evidence in the record clearly indicating that the fracture of the femur suffered by Scamperino also affected his right hip, which is neither a part of the leg [citing cases] nor a schedule injury. . . ."); *Yanez v. Skousen Construction Co.*, 78 N.M. 756, 438 P.2d 166 (1968) (injury to hip not sched-uled injury when hip motion restricted); *Altus House Nursing v. Roberts*, 646 P.2d 9 (Okla.App.1982) (hip joint injury held to be unscheduled); *Foster v. State Accident Insurance Fund*, 259 Or. 86, 485 P.2d 407 (1971) (shoulder injury resulting in partial loss of use of arm; held that separate awards for scheduled and unscheduled disabilities should be given); *Manno v. Tri-State Engineering Co.*, 159 Pa.Super. 267, 48 A.2d 122 (1946); *Texas Employers' Insurance Association v. Nelson*, 534 S.W.2d 150 (1976) (disability in shoulder held to be unscheduled).

*Blackburn v. Allied Chemical Corp.*, 616 S.W.2d 600 (Tenn.1981), is factually similar to the present case. In *Blackburn*, the claimant had broken the head and neck of her femur. By surgical procedure, a pin was installed. This pin began to scratch the surface of the hip socket, causing disability in the hip joint itself. Over the employer's argument that the disability was to be limited to the leg schedule, the court held it was an injury to the body as a whole. It said:

> The surgical pin used to reduce the fracture in this case protrudes into the hip socket. . . . The hip socket itself is part of the pelvis; the head of the femur fits into it in a ball-and-socket joint. The lower part of the pelvis, a cavity called the acetabulum, envelops the head of the femur. The acetabulum itself, into which the surgical pin protrudes and causes pain, is not a part of the femur or of the left lower extremity. *See* 1B, R. Gray, *Attorneys' Textbook of Medicine* § 8.00 (3d ed. 1980); *Stedman's Medical Dictionary* p. 647 (4th ed. 1976).

*Id.* at 601–02.

Another case similar on its facts is *Jeffers v. Pappas Trucking, Inc.*, 198 Neb. 379, 253 N.W.2d 30 (1977). In that case, as in the present one, the claimant broke the head of his femur, and a total hip replacement was required. The court held that the resulting impairment in the hip joint was to be compensated as a disability to the body as a whole. In doing so, it quoted from a Texas case which we believe is

appropriate. In that case, the Texas court said that

> [a]n injury confined to the femur is also confined to the leg. In our opinion, however, injuries to the joint connecting the femur or the thigh to the trunk, that is the hip joint, were not intended to be included in injuries to the leg as contemplated by the statute. The femur extends to and into the hip but it stops at the joint. It does not include the joint and the court did not err in so instructing the jury.

*Texas Employers' Insurance Associates v. Sevier*, 279 S.W.2d 473, 477 (Tex.Civ.App. 1955).

 Looking now to our own statute, we note several principles of statutory interpretation which are implicated. Words of a statute are to be given their ordinary meaning unless a contrary intent is apparent, Iowa Code § 4.1(2); *Welp v. Iowa Department of Revenue*, 333 N.W.2d 481, 483 (Iowa 1983); *City of Fort Dodge v. Iowa Public Employment Relations Board*, 275 N.W.2d 393, 396 (Iowa 1979), or unless the "ordinary" meaning is doubtful, or so interpreting it would lead to injustice, absurdity, or contradictions between statutes. *Id.* A "leg," under the general understanding of the word, simply does not include a hip.

Moreover, because the primary purpose of workers' compensation statutes is to benefit workers and their dependents insofar as the statute permits, the statute should be interpreted with a view toward that objective. *Caterpillar Tractor Co. v. Shook*, 313 N.W.2d 503, 506 (Iowa 1981). *See also Doerfer Division of CCA v. Nicol*, 359 N.W.2d 428, 434 (Iowa 1984); *Beier Glass Co. v. Brundige*, 329 N.W.2d 280, 283 (Iowa 1983).

Finally, although the final interpretation of a statute is for this court, we give deference to the interpretation of statutes by the responsible administrative agency. *Beier*, 329 N.W.2d at 283. In this case, the industrial commissioner interpreted the leg schedule as not including a hip.

We conclude that Iowa Code section 85.-34(2)(*o* ), in defining a leg, does not include a hip joint.[1]

B. *The administrative rule.* Lauhoff argues that the industrial commissioner, by concluding that the hip injury was not a scheduled injury, violated Iowa Administrative Rule 500–2.4(85) which provides, in part, that

> [t]he Guides to the Evaluation of Permanent Impairment published by the American Medical Association are adopted as a guide for determining permanent partial disabilities.... The extent of loss or percentage of permanent impairment *may* be determined by use of this guide....

(Emphasis added.) The AMA guide, Lauhoff argues, would include the hip as a part of the leg for compensation purposes.

 The administrative rule, by its terms, provides that the AMA publication is only a guide which *may* be used. The agency rule further provides that

> [n]othing in this rule shall be construed to prevent the presentations of other medical opinion or guides for the purpose of establishing that the degree of permanent impairment to which the claimant would be entitled would be more or less than the entitlement indicated in the AMA guide.

Iowa Admin.Code § 500–2.4(85).

Under this rule, the industrial commissioner was not bound to follow the AMA guide. The AMA guide relied on is of

---

**1.** While Lauhoff argues that, to reach this point, we must overrule our case of *Kellogg v. Shute & Lewis Coal Co.*, 256 Iowa 1257, 130 N.W.2d 667 (1964), we do not agree. *Kellogg* created some confusion by suggesting that *Dailey* held a hip is included in the leg schedule. *See Kellogg*, 256 Iowa at 1266, 130 N.W.2d at 671. However, it is obvious from reading *Dailey* that this was not its holding. *See* 233 Iowa at 763, 10 N.W.2d at 573 (injury to parts of body including hip socket said to be "injuries to parts of body which are no part of the leg."). Moreover, *Kellogg* itself recognized that a hip injury *can* be a disability of the body as a whole, relying on *Dailey*, but refused to allow such recovery because of the lack of evidence of impairment. *Kellogg*, 256 Iowa at 1266–67, 130 N.W.2d at 671–72. *Kellogg* is therefore consistent with our earlier cases of *Alm* and *Dailey* and with the result in the present case.

doubtful authority in this case, in any event, because it includes the hip as a part of the "lower extremity," a term which is not found in our statutory schedule.

■ In any event, this administrative rule, if it were to have the impact Lauhoff seeks, would be contrary to Iowa Code section 85.34(2)(*o*) as we have interpreted it, and therefore could not stand.

## II. *Impairment of the Hip Joint.*

■ Lauhoff argues that, even if a hip is considered to be a part of the body as a whole, there can be no recovery of benefits for industrial disability unless it is shown that a part of the body other than the leg is impaired. This, of course, is true. It argues, however, that, since the function of a hip is to provide articulation for the leg, impairment of the hip translates only into impairment of the leg, and is therefore governed by the leg schedule.

We reject this argument; the impairment of body functions in this case were in the hip, not the leg, and we will not consider these functions to be coextensive merely because the hip function impacts on that of the leg. To do so would extend the application of Iowa Code section 85.34(2)(*o*) beyond its express terms by applying it to a body member not expressly included. The result would be a rupturing of the conceptual tidiness which is said to be the very essence of the scheduled-injury approach. *See Simbro v. DeLong's Sportswear*, 332 N.W.2d 886, 889 (Iowa 1983) (McCormick, J., concurring specially); *Graves v. Eagle Iron Works*, 331 N.W.2d 116, 120 (Iowa 1983) (McCormick, J., specially concurring); 2 A. Larson, *supra*, § 58.23, at 10–270 to 10–271 (a group of injuries "tak[ing] the form of a neatly classifiable loss of a member").

In any event, there was evidence in this case from which the commissioner could have found an impairment of functions not directly related to the leg. As already noted, Dr. Miller was asked that specific question, whether the impairment involved was to McIntosh's leg or to parts of his body beyond the leg. His response was that the impairment went beyond the leg, without elaboration. Further, McIntosh and his wife testified about his condition before and after the hip replacement. While much of the disability testified to involved leg-related functions such as walking, standing, lifting, and crawling, there is also evidence of impairments which were not directly related to leg functions. For example, there was testimony that McIntosh had a disabling pain in his hip and lower back, but none in the leg itself.

## III. *The Commissioner's Ruling.*

■ Lauhoff argues that, even if evidence of impairment of the body as a whole was in the record, the industrial commissioner made no such finding. It claims he merely found there was an *injury* to the hip socket by reason of the surgical procedure and concluded from that fact alone that there was an impairment of the body as a whole. This, it contends, was error; an injury does not per se amount to an impairment.

The commissioner, after reciting portions of the evidence, found the following facts:

1. On June 21, 1978 claimant suffered a work injury to the femoral neck of the left leg.

2. Deterioration of the femur head lead to corrective surgery.

3. On November 11, 1980 Dr. Miller replaced claimant's left hip joint.

4. The surgery involved constructing a new socket in the acetabulum.

5. The acetabulum is an area of the body extending beyond the hip joint.

6. *The surgical procedure has extended claimant's disability to the body as a whole.*

7. As a result of the work injury, claimant is entitled to compensation for an industrial disability.

(Emphasis added.) Lauhoff points to the emphasized finding, number 6, in arguing that the industrial commissioner had erroneously ruled that the surgery alone was tantamount to a disability to the body as a whole.

One of the basic principles of judicial review in workers' compensation cases is that, because the commissioner is the fact

finder, his findings are binding on the court if supported by substantial evidence. *Ward v. Iowa Department of Transportation,* 304 N.W.2d 236, 237 (Iowa 1981); *Second Injury Fund v. Mich Coal Co.,* 274 N.W.2d 300, 303 (Iowa 1979). We will broadly and liberally apply those findings in order to uphold, rather than defeat, the commissioner's decision. *Ward,* 304 N.W.2d at 237; *Holmes v. Bruce Motor Freight, Inc.,* 215 N.W.2d 296, 298 (Iowa 1974).

Even when the commissioner's ruling is read in light of these principles, however, we cannot say with certainty that his findings of disability to the body as a whole were based upon actual impairment of the hip, rather than on the surgical intrusion alone, as the ruling suggests. We therefore remand for a determination, on the record already made, on the question of impairment of the body as a whole.

DECISION OF COURT OF APPEALS VACATED; JUDGMENT OF DISTRICT COURT AFFIRMED IN PART AND REVERSED IN PART; REMANDED WITH INSTRUCTIONS.

All Justices concur except NEUMAN, J., who takes no part.