**SECOND INJURY FUND OF IOWA, Appellee,**

v.

**Perry NELSON, Appellant,**

and

**Basic Materials Corp. and Wausau Insurance Cos., Appellees.**

No. 94–967.

Supreme Court of Iowa.

Dec. 20, 1995.

As Amended on Denial of Rehearing Feb. 14, 1996.

Robert W. Pratt and Max Schott, Des Moines, for appellant.

Philip H. Dorff, Jr. and Anne L. Clark of Hopkins & Huebner, P.C., Des Moines, for appellees Basic Materials Corp. and Wausau Insurance Cos.

Thomas J. Miller, Attorney General, and Shirley A. Steffee, Assistant Attorney General, for appellee Second Injury Fund.

Considered by HARRIS, P.J., and CARTER, NEUMAN, SNELL, and TERNUS, JJ.

TERNUS, Justice.

Appellant, Perry Nelson, injured his right shoulder while working for appellee, Basic Materials Corp. In ruling on his claim for workers' compensation benefits, the industrial commissioner awarded permanent partial disability benefits for this injury against Basic Materials and its insurer, appellee, Wausau Insurance Companies. The commissioner allowed an additional recovery from the appellee, Second Injury Fund of Iowa, for industrial disability caused by a prior knee injury. On judicial review, the district court affirmed the award of permanent partial disability benefits and reversed the judgment against the Second Injury Fund.

We conclude the industrial commissioner's determination of permanent partial disability benefits was affected by two errors of law: (1) the commissioner did not include in his calculation of industrial disability the disability arising from Nelson's prior work-related knee injury; and (2) the commissioner considered Nelson's age as a factor that decreased, rather than increased, Nelson's industrial disability because Nelson would suffer less total future wage loss than a younger worker. Therefore, we reverse the judgment against Basic Materials and Wausau and remand for further proceedings consistent with this opinion. We affirm the district court's ruling that the Second Injury Fund has no liability for Nelson's industrial disability because Fund liability was not triggered by the injury to Nelson's shoulder, a nonscheduled member.

I. *Background Facts and Proceedings.*

A. *Facts.* Perry Nelson was born in 1931 and graduated from high school in 1949 with honors and a college scholarship. However, Nelson chose not to attend college and instead accepted a position with Concrete Materials. (The assets of Concrete Materials changed ownership over the years until they were purchased by Basic Materials sometime prior to 1988.) Concrete Materials operated a rock quarry; Nelson ran various pieces of equipment.

In 1963 Nelson suffered a serious injury at work. At this time, he worked as a mechanic, welding and repairing construction equipment. While working on a piece of equipment containing two large augers, his left leg became entangled in one of the augers. Nelson had several surgeries over two years engendering an extended rehabilitative process. He received workers' compensation benefits for this injury, including an award for a thirty percent impairment to his left lower extremity. He returned to work a year after his leg injury and performed sedentary tasks for four or five years before resuming his duties as a mechanic.

Nelson continued to suffer from the residual effects of this injury up to the date of his second injury. Due to his ongoing left knee problems, Nelson saw an orthopaedic surgeon, Dr. McCoy in 1983. Dr. McCoy recorded that Nelson suffered from severe knee pain and could barely stand by the end of the day. He diagnosed developing degenerative arthritis.

In 1988 Nelson sustained the injury which precipitated this action. While working on a conveyor he fell from a ladder, hitting his left shoulder on the ground. Dr. McCoy eventually diagnosed a rotator cuff tear and advised Nelson to have surgery to repair the tear. The doctor also diagnosed severe degenerative arthritis in Nelson's left shoulder and both knees, as well as partial deafness. McCoy believed Nelson was a candidate for total knee substitution on both sides, but recommended that Nelson wait as long as he could: McCoy thought Nelson "could not continue working at his present job after a total knee substitution as one would not expect the total knee joint to last long with that level of heavy physical activity."

In November 1988 Nelson had surgery on his left shoulder. Afterward, he had a permanent restriction of twenty pounds lifting with the left shoulder and a thirteen percent functional impairment rating to the left upper extremity. In May 1989 McCoy indicated that Nelson had achieved maximum recuperation from his shoulder injury. However, McCoy believed the severe arthritis in Nelson's knees prevented Nelson from returning to heavy labor. Therefore, McCoy recommended that Nelson go ahead with the knee replacements and retire from his job.

Nelson decided not to return to work and was terminated by Basic Materials in August 1990. He had left knee replacement surgery in December 1990, and at the time of the workers' compensation hearing, was planning to have the right knee surgery early in 1991.

B. *Record in workers' compensation proceeding.* Nelson filed a petition for workers' compensation benefits in July 1989, seeking benefits for his 1988 shoulder injury. He did not claim that either of his knees were materially aggravated by the 1988 fall, nor did he make a claim for cumulative injury to his knees.

The medical evidence at trial showed that Nelson's shoulder impairment was caused by the 1988 injury. This injury also aggravated Nelson's preexisting, yet dormant, degenerative arthritis in his left shoulder. McCoy reported that the 1963 injury played a significant role in the progressive arthritic deterioration of Nelson's left knee; McCoy related the arthritis in Nelson's right knee to the wear and tear of general use. McCoy believed that Nelson could have returned to some sort of employment for Basic Materials if the shoulder injury had been Nelson's only problem. However, because of Nelson's arthritic knees, McCoy thought Nelson could not work.

Both Nelson and Basic Materials obtained evaluations from vocational rehabilitation specialists. The conclusions of these experts, as summarized in the commissioner's decision, were nearly identical:

> Both vocational rehabilitation specialists . . . found that claimant's knees were the primary culprit in preventing him from returning to the competitive labor force. Secondary to the knee problems both vocational rehabilitation specialists found that claimant's shoulder injury in combination with his knees and his deafness also made him an unlikely candidate for the competitive labor market. However, if the enquiry was only limited to claimant's shoulder injury, both vocational rehabilitation specialists indicated that claimant would be able to do sedentary or light work. The vocational rehabilitation specialists for claimant went on to indicate that because claimant's transferable skills were limited to the quarry industry, that claimant's transferable skills were not desirable by employers who were in search [of] employees in the competitive market.

Nelson did not look for work after his shoulder surgery. Basic Materials attempted to accommodate Nelson's shoulder injury by allowing him to drive a truck. However, McCoy felt that this job was not suitable because Nelson's knees would prevent him from operating the clutch required to shift gears.

At the hearing on his petition for benefits, Nelson argued that his shoulder injury in combination with his prior knee injury and his hearing loss made him totally and permanently disabled. He relied in part on the odd-lot doctrine. Basic Materials urged that it was not liable for any preexisting condition that was not aggravated by the 1988 fall. The Second Injury Fund further contended that its liability was not triggered because Nelson's second injury was to the body as a whole and not to a scheduled member.

C. *Rulings of the agency and the district court.* The deputy industrial commissioner issued a decision ruling that Basic Materials was liable only for the industrial disability resulting from the shoulder injury. The deputy concluded that the odd-lot doctrine did not apply because Nelson's inability to obtain employment was due to his knee injury, not his shoulder injury, and because Nelson had not looked for a job. The deputy then considered the extent of industrial disability caused by Nelson's shoulder injury. She considered several factors affecting Nelson's earning capacity, including his age: "Claimant is near the end of the normal work life. Compared to a younger worker with the same injury, claimant has lost less future earning capacity as a result of his age." The deputy concluded Nelson had an eighteen percent industrial disability from his shoulder injury.

Finally, the deputy decided the Second Injury Fund had no liability because Nelson's shoulder injury was considered an injury to the body as a whole. The deputy ruled that only an injury to "a hand, an arm, a foot, a leg or an eye" would trigger Fund liability.

*See* Iowa Code § 85.64 (1989). Nelson was awarded healing period benefits and permanent partial disability benefits in the amount of eighteen percent against Basic Materials.

On appeal to the industrial commissioner, the commissioner adopted the deputy's findings and conclusions concerning Basic Materials' liability. However, with respect to the Second Injury Fund's liability, the commissioner concluded that "an injury which affects a scheduled member is all that is necessary." The commissioner found that Nelson's shoulder injury affected his arm and therefore, the Second Injury Fund was liable for Nelson's cumulative industrial disability. Finding Nelson's cumulative industrial disability to be thirty-five percent, the Fund's liability was established as nineteen weeks of compensation.

Nelson and the Second Injury Fund filed petitions for judicial review. The district court affirmed the commissioner's finding that Nelson sustained an eighteen percent industrial disability as a result of his shoulder injury. However, the court reversed the commissioner's decision to award benefits from the Second Injury Fund, holding that because Nelson's second injury was not to a scheduled member, Fund liability was not triggered. Nelson appealed.

## II. *Scope of Review.*

■■ Our review of this case is governed by Iowa Code chapter 17A, Iowa's administrative procedure act. *See* Iowa Code § 86.26 (1995). We review for errors of law. *Squealer Feeds v. Pickering*, 530 N.W.2d 678, 681 (Iowa 1995). We may reverse, modify, affirm or remand to the agency for further proceedings if the agency's action is affected by an error of law or if it is not supported by substantial evidence. Iowa Code § 17A.19(8) (1995). Although we give limited deference to the industrial commissioner's interpretation of the statutes governing his agency, the proper interpretation of the workers' compensation statute is a question of law for this court. *Second Injury Fund v. Braden*, 459 N.W.2d 467, 468 (Iowa 1990).

## III. *Liability for Pre–Existing Industrial Disability.*

Nelson and Basic Materials disagree on the correctness of the commissioner's finding that Nelson suffered only an eighteen percent industrial disability. Although both parties speak in terms of the substantiality of the evidence to support this finding, their real dispute is with the applicable principles of law which govern the commissioner's consideration of this issue. Nelson argues that his shoulder injury in combination with his hearing loss and knee problems make him totally disabled. Basic Materials claims that it cannot be held liable for any industrial disability not directly caused by the injury sustained in the 1988 fall. The industrial commissioner took the approach urged by Basic Materials. We think this was error.

An employer's liability for an employee's industrial disability is complicated when that disability results in part from a prior injury or condition. In deciding this case, it is helpful to summarize the various rules that might apply in successive-injury situations.

■■ A. *The apportionment rule.* Iowa applies a rule of apportionment in limited situations. When a prior injury, condition or illness, *unrelated to employment, independently* produces an *ascertainable* portion of an injured employee's cumulative industrial disability, the employer is liable only for that portion of the industrial disability attributable to the current injury. *Varied Enterprises, Inc. v. Sumner*, 353 N.W.2d 407, 411 (Iowa 1984). In other words, the industrial disability is apportioned between that caused by the work-related injury and that caused by the nonwork-related condition or injury. The employer is liable only for the work-related portion.

■■ It is important to recognize two limitations on this rule. First, the prior injury or condition must cause an "ascertainable portion" of the ultimate industrial disability. *Id.* Thus, if the portion of the industrial disability resulting from the pre-existing, nonwork-related injury or condition cannot be determined, the employer is liable for the full industrial disability of the employee. *Tussing v. George A. Hormel & Co.*, 461

N.W.2d 450, 453 (Iowa 1990); *Varied Enterprises*, 353 N.W.2d at 411.

 Second, the prior injury or condition must "independently" produce some degree of *industrial* disability before the second injury. *Bearce v. FMC Corp.*, 465 N.W.2d 531, 535 (Iowa 1991); *Varied Enterprises*, 353 N.W.2d at 411. Hence, the apportionment rule does not apply where the prior condition or injury has not caused any industrial disability. *Bearce*, 465 N.W.2d at 535, 537. Similarly, the apportionment rule does not apply where the second injury aggravates the pre-existing condition. *Id.* at 536; *Rose v. John Deere Ottumwa Works*, 247 Iowa 900, 908, 76 N.W.2d 756, 760–61 (1956). In these situations, the employer is liable for the full industrial disability.

 B. *The full-responsibility rule.* Perhaps most importantly, the rule allowing apportionment for prior conditions causing industrial disability does not apply to conditions and injuries related to employment. *See Tussing*, 461 N.W.2d at 453. When there are two successive *work-related* injuries, the employer liable for the second injury "is generally held liable for the entire disability resulting from the combination of the prior disability and the present injury." *Celotex Corp. v. Auten*, 541 N.W.2d 252, 254 (Iowa 1995). In another opinion filed today, we applied this "full responsibility" rule, holding the employer liable for its employee's 100% permanent industrial disability resulting from a recent work-related injury and two prior work-related injuries. *Id.* Thus, the employer liable for the current injury is also liable for any preexisting industrial disability caused by a work-related injury when that disability combines with industrial disability caused by a later injury.

 C. *Applicability of apportionment and full-responsibility rules here.* Any ascertainable portion of Nelson's industrial disability resulting independently from non-work-related injuries or conditions is subject to apportionment. However, Nelson's 1963 injury was work related. Therefore, to the extent the 1963 injury caused industrial disability prior to Nelson's 1988 fall, the full-responsibility rule applies. Although the industrial commissioner concluded that Nelson was totally disabled from his knee injury, he did not consider whether any of this industrial disability predated Nelson's 1988 fall. This was error. Therefore, we must reverse the district court's decision affirming the industrial commissioner's determination of industrial disability and remand for further proceedings.

On remand the industrial commissioner need not separately compute the extent of industrial disability caused by the left knee injury. Rather, any impairment caused by this prior injury as of the date of the shoulder injury will be one of the factors used to measure Nelson's industrial disability. Thus, if Nelson's employability at the time of the 1988 fall was affected by the existence of his prior knee injury, the industrial commissioner must include the impact of that prior injury in the calculation of industrial disability. Any disability resulting from the left knee injury *after* the occurrence of the shoulder injury shall not be considered.

Although our decision on this issue requires a reversal, we proceed to address the other issues raised on appeal since they are likely to recur on remand.

IV. *Age as a Factor in Industrial Disability.*

 The industrial commissioner discussed Nelson's age as a factor in the calculation of Nelson's industrial disability:

Claimant's proximity to normal retirement age also affects his industrial disability. Claimant is near the end of the normal work life. Compared to a younger worker with the same injury, claimant has lost less future earning capacity as a result of his injury.

Nelson complains that the industrial commissioner erroneously considered his age as a factor that reduced the amount of his industrial disability. We agree that this was error.

 Industrial disability measures an injured worker's lost earning capacity. *Second Injury Fund v. Shank*, 516 N.W.2d 808, 813 (Iowa 1994). Factors that should be considered include the employee's functional

impairment, age, intelligence, education, qualifications, experience, and the ability of the employee to engage in employment for which he is suited. *Id.* Thus, the focus is not solely on what the worker can and cannot do; the focus is on the ability of the worker to be gainfully employed. *Guyton v. Irving Jensen Co.,* 373 N.W.2d 101, 104 (Iowa 1985).

■■■■■ Even more important for purposes of our discussion here is the concept that industrial disability rests on a comparison of what the injured worker could earn before the injury as compared to what the same person could earn after the injury. Thus, the level of post-injury earnings is important evidence of whether the injury impaired the worker's capacity to earn. IC Arthur Larson, *The Law of Workmen's Compensation* § 57.31(a), at 10–205 (1995). However, the commissioner here did not merely consider whether Nelson had the ability to earn the same wages after his shoulder injury as he could earn before his shoulder injury. The commissioner compared what Nelson could earn over his remaining worklife after his injury with what a hypothetical worker with the same characteristics, but younger, could earn. This comparison is irrelevant in determining Nelson's *lost earning capacity.* A calculation of the number of years of wages lost by Nelson might be helpful in assessing tort damages for *lost earnings,* but that is not the issue in a workers' compensation case. *Thilges v. Snap–On Tools Corp.,* 528 N.W.2d 614, 616–17 (Iowa 1995) (rejecting argument that "loss of earning capacity should be established with reference to loss of earnings that the injured employee will experience over that person's lifetime").

■■■■ An example might illustrate the distinction. Assume Nelson earned $1000 per week before his fall and $900 per week after his fall. This reduction in earnings is some evidence that his capacity to earn has been impaired. The fact that the effect of this impairment might be felt over fewer years than it would had Nelson been younger at the time of his injury does not affect the extent of the impairment itself. Again, the measure of industrial disability is the "extent to which the injury impairs the employee['s]

*ability* to earn wages," *Simbro v. Delong's Sportswear,* 332 N.W.2d 886, 887 (Iowa 1983) (emphasis added), not the dollar amount of earnings lost.

■■■ When the industrial commissioner concludes, as he did here, that an older employee's industrial disability is less because the employee has fewer years left to work, what the commissioner is really saying is that the total amount of future lost wages is a factor in setting the degree of industrial disability. The incorrectness of this analysis is illustrated by applying this concept in another factual context. If the total amount of future lost wages affects the amount of industrial disability, then highly paid workers would be entitled to a greater industrial disability rating than workers in lower-paying jobs. This result would occur even though the two workers' capacities to be employed at the same level as they were employed before the injury are the same. This illustration highlights the fact that the comparison made in determining industrial disability is the worker's capacity to earn before and after the injury, not the worker's capacity to earn as compared to other workers.

■■■ We agree with Nelson that the commissioner's consideration of Nelson's age as a factor *reducing* his industrial disability because Nelson would suffer less total future wage loss than a younger worker was erroneous. Our conclusion does not mean that age is irrelevant to determining industrial disability. To the extent Nelson's age affects his actual employability, it is appropriately considered. As the industrial commissioner recognized in his decision, Nelson's age would limit the retraining options available to him. Additionally, one of the vocational rehabilitation experts reported that Nelson would "run into the problem of being accepted by [an] employer at age sixty" and "at sixty years old you have to have some other skills that are pretty marketable if you are going to get on with a new employer." *See also Diederich v. Tri–City Ry.,* 219 Iowa 587, 594, 258 N.W. 899, 902 (1935) (recognizing that a fifty-nine-year-old man would find it difficult to find employment in a new field). There is simply no evidence in the record that Nel-

son's age would increase his employability and thereby, reduce the level of his industrial disability. Therefore, we hold the commissioner committed reversible error in concluding that Nelson had less industrial disability than he otherwise would have had merely because he was near retirement age.

### V. *Prima Facie Showing For the Odd-Lot Doctrine.*

Nelson claims that the industrial commissioner erred in failing to find that he is an odd-lot employee. An odd-lot employee is one who is incapable of finding work in any established branch of the labor market. *Guyton,* 373 N.W.2d at 105. "[I]f the only services the worker can perform are 'so limited in quality, dependability, or quantity that a reasonably stable market for them does not exist,'" then the employee falls in the odd-lot category and is totally disabled. *Id.* (quoting *Lee v. Minneapolis St. Ry.,* 230 Minn. 315, 41 N.W.2d 433, 436 (1950)). This conclusion follows from the fact that "[a] person who has no reasonable prospect of steady employment has no material earning capacity." *Id.*

The difficulty in Nelson's case comes not from the principle that an odd-lot employee is totally disabled, but from the process by which the worker proves he is an odd-lot employee. We held in *Guyton*

> that when a worker makes a prima facie case of total disability *by producing substantial evidence that the worker is not employable in the competitive labor market,* the burden to produce evidence of suitable employment shifts to the employer. If the employer fails to produce such evidence and the trier of fact finds the worker does fall in the odd-lot category, the worker is entitled to a finding of total disability.

*Id.* at 106 (emphasis added). We also said, however, that it is "normally" incumbent on the claimant "'to demonstrate a reasonable effort to secure employment'" in the worker's area of residence before the burden of producing evidence shifts to the employer. *Id.* at 105 (quoting *Employers Mut. Liability Ins. Co. of Wisconsin v. Industrial Comm'n,* 25 Ariz.App. 117, 119, 541 P.2d 580, 582

(1975)). The practical effect of this burden-shifting rule is that when a claimant is an odd-lot employee, we presume that no jobs are available unless the employer introduces evidence of such work. Nevertheless, the ultimate burden of persuasion on the issue of industrial disability always remains on the employee. *Id.*

The fighting issue here is whether the requirement of reasonable efforts to obtain employment is necessary if the employee otherwise produces "substantial evidence that the worker is not employable in the competitive labor market." Nelson claims he introduced such evidence here when both vocational rehabilitation experts testified that Nelson could not return to his past employment and was unable to be competitively employed. In addition, Dr. McCoy testified that Nelson's bad knees and shoulder "would prevent him from working."

The industrial commissioner and district court ruled that Nelson had not met the threshold requirement for application of the odd-lot doctrine because he had not looked for work. However, we agree with Nelson that such proof is not an absolute prerequisite if the employee introduces other *substantial* evidence that he has no reasonable prospect of steady employment. *Pomerinke v. Excel Trucking Transport,* 124 Idaho 301, 306, 859 P.2d 337, 342 (1993) (claimant does not have to search for work as a prerequisite to odd-lot status if he shows his efforts would have been futile); *cf. Peoples v. Cone Mills Corp.,* 316 N.C. 426, 342 S.E.2d 798, 809 (1986) (in affirming decision that employee was totally and permanently disabled, court held that the employee need not show that he had unsuccessfully sought work if he demonstrates that any "effort to obtain employment would be futile because of age, inexperience, lack of education or other preexisting factors"); *Phillips v. Liberty Mut.,* 67 Or.App. 692, 679 P.2d 884, 887 (1984) ("A claimant, however, need not make efforts to work if those efforts would be futile."). Any other rule would require clearly unemployable claimants to go through the futile exercise of searching for nonexistent employment. Moreover, mere proof that the claimant can-

not find a job would not necessarily mean he is totally and permanently disabled. A particular employee may be a likely candidate for vocational retraining that would enable him to obtain employment in the future even though he is currently unemployable.

In summary, we think it is too mechanistic to equate a current inability to obtain employment with the odd-lot doctrine. Clearly, in the typical case the employee will want to demonstrate a good faith, unsuccessful effort to find steady employment since such evidence, although not determinative, is certainly persuasive evidence that he cannot be employed. On the other hand, we conclude there are other factors that are also important in determining whether someone falls in the odd-lot category such as the claimant's physical impairment, intelligence, education, training, ability to be retrained and age. *See Guyton,* 373 N.W.2d at 105. Substantial evidence that these factors show the worker is capable only of odd-lot work can suffice to prove a prima facie case and shift the burden of producing evidence of suitable work to the employer. We point out that it is not necessary that the employee's evidence be so strong as to compel a finding that he is an odd-lot employee as a matter of law; it is merely necessary that he generate a fact question on this issue, through the introduction of *substantial* evidence, to establish a prima facie case.

We think Nelson has established a prima facie case that he is an odd-lot employee through the consistent testimony of the medical and vocational experts that he cannot work in the competitive job market together with evidence of his age, his multiple physical impairments (knees, shoulder and deafness) and his lack of education and training for any employment other than manual labor. Therefore, the burden of producing evidence shifts to Basic Materials to show that jobs were available that Nelson could perform.

Basic Materials offered evidence of two possible employment opportunities. It offered Nelson a position driving a truck at the quarry. However, the uncontroverted medical testimony was that Nelson would not be able to operate the clutch because of his knee problems. The second job possibility was less definite. Basic Materials' general manager testified that had Nelson returned to the quarry in June of 1989, the company "would have made every effort to find something, a productive job for him." This testimony is too vague to support a finding that a steady job that Nelson was capable of performing actually existed. *See Spitzack v. Berg Corp.,* 532 N.W.2d 72, 76 (S.D.1995) ("the employer must establish that there are positions actually open and available"); *see Thilges,* 528 N.W.2d at 617 (finding industrial commissioner properly considered claimant's ability to find employment in competitive market "without regard to the accommodation furnished" by the claimant's present employer); *Cone Mills Corp.,* 342 S.E.2d at 805 ("an injured employee's earning capacity must be measured not by the largesse of a particular employer, but rather by the employee's own ability to compete in the labor market"). Thus, the industrial commissioner was required to presume that there was no suitable work regularly and continuously available that Nelson could perform.

Although Nelson successfully established that he fell within the odd-lot category, a conclusion that Basic Materials is liable for Nelson's total and permanent disability is not compelled as a matter of law. It is still essential that Nelson's disability be caused by conditions and injuries for which Basic Materials must compensate him, as discussed above. *Guyton,* 373 N.W.2d at 106 (even though employee established a prima facie case that he was totally disabled, such a finding was not compelled as a matter of law because there was evidence his inability to find a job was attributable to an unsatisfactory work record unrelated to his injury).

## VI. *Application of Second Injury Fund to Body-as-a-Whole Injury.*

The district court reversed the industrial commissioner's conclusion that the Second Injury Fund was liable for any industrial disability attributable to Nelson's 1963 knee injury. The court held that Fund liability is not triggered when the second injury is unscheduled, as it was here. We agree.

Iowa Code section 85.64 apportions liability for an industrial disability caused by two successive injuries between the employer and the Second Injury Fund in certain situations:

If an employee who has previously lost, or lost the use of, one hand, one arm, one foot, one leg, or one eye, becomes permanently disabled by a compensable injury which has resulted in the loss of or loss of use of another such member or organ, the employer shall be liable only for the degree of disability which would have resulted from the latter injury if there had been no pre-existing disability. In addition to such compensation, and after the expiration of the full period provided by law for the payments thereof by the employer, the employee shall be paid out of the "Second Injury Fund" created by this division the remainder of such compensation as would be payable for the degree of permanent disability involved after first deducting from such remainder the compensable value of the previously lost member or organ.

Under the circumstances specified in the statute, the Fund is responsible only for the difference between the compensation for which the current employer is liable and the total amount of industrial disability from which the employee suffers, reduced by the compensable value of the first injury. *Shank*, 516 N.W.2d at 812; *Braden*, 459 N.W.2d at 470. We held in *Shank* that the statute applies when

(1) the employee has either lost, or lost the use of a hand, arm, foot, leg, or eye; (2) the employee sustained the loss, or loss of use of another such member or organ through a work related—that is, compensable—injury; and (3) there must be some permanent disability from the injuries.

*Shank*, 516 N.W.2d at 812. The disagreement here centers on the second requirement: Is Nelson's shoulder injury "the loss, or loss of use of another such member"—the arm?

Before we directly address that question, however, we review the distinction between a scheduled and unscheduled loss. The workers' compensation statute provides a schedule of benefits for injuries to specific members of the body. *See* Iowa Code § 85.34(2) (1995). The members listed in section 85.34(2) include the fingers, toes, hands, feet, arms, legs, and eyes. *Id.* Loss of hearing and disfigurement of the face or head are also scheduled injuries under section 85.34(2). *Id.*

Disabilities resulting from injuries other than those listed in section 85.34(2) are considered unscheduled injuries; benefits for unscheduled injuries are based on injury to the body as a whole. *Shank*, 516 N.W.2d at 813. We have previously held that an injury to a joint such as a hip or shoulder should be treated as an injury to the body as a whole, not as a scheduled injury. *Lauhoff Grain Co. v. McIntosh*, 395 N.W.2d 834, 837–39 (Iowa 1986); *Alm v. Morris Barick Cattle Co.*, 240 Iowa 1174, 1177, 38 N.W.2d 161, 163 (1949).

The ultimate question here is whether an unscheduled injury can trigger Second Injury Fund liability. The commissioner interpreted section 85.64 to require an injury that merely affects a scheduled member; thus, he held that Nelson's unscheduled shoulder injury that affects his arm, a scheduled member, is sufficient to make the Fund liable. This conclusion is inconsistent with the clear language of section 85.64 as well as with our prior cases interpreting the workers' compensation statute.

Section 85.64 lists specific members, the injury of which triggers Fund liability. All of the injuries listed are scheduled injuries. We have consistently interpreted the workers' compensation statute as making a clear distinction between scheduled and unscheduled injuries. *E.g., Second Injury Fund v. Bergeson*, 526 N.W.2d 543, 547 (Iowa 1995); *Lauhoff Grain*, 395 N.W.2d at 839, 840; *Alm*, 240 Iowa at 1177, 38 N.W.2d at 163. We find nothing in section 85.64 that would cause us to blur that distinction here. *See Lauhoff Grain*, 395 N.W.2d at 840 (refusing to apply benefits schedule for injury to the leg merely because the hip impairment affects the leg); *see also Taylor v. Pfeiffer Plumbing & Heating Co.*, 8 Ark.App. 144, 648 S.W.2d 526, 527 (1983) ("Even if the effects of the shoulder injury extended into his arm ..., this fact would not make the

injury a scheduled one."). As we observed in *Lauhoff Grain,* the word "leg" as used in section 85.34 "simply does not include a hip." *Lauhoff Grain,* 395 N.W.2d at 839. Likewise, the word "arm" as used in section 85.64 simply does not include the shoulder.

■ We conclude that section 85.64 requires two scheduled injuries to invoke Fund liability. *See Bergeson,* 526 N.W.2d at 548 ("Under the statute, a second *scheduled* injury to a hand, arm, foot, leg or eye, invokes the Fund's liability.") (emphasis added) (dicta); *Braden,* 459 N.W.2d at 470 ("Section 85.64 provides that where an employee suffers two '*scheduled*' losses, the employer is only liable for . . .") (emphasis added) (dicta); Harry W. Dahl, *The Iowa Second Injury Fund—Time For Change,* 39 Drake L.Rev. 101, 105, 108, 119 (1989–90) (observing that Iowa's second injury fund law provides "narrow coverage" because it does not cover all types of preexisting impairments, that Iowa's law "limit[s] coverage to specific 'schedule' losses" and that both the first and second injuries must "be to a scheduled part named in the Iowa Act"). We disavow any contrary implication in *Second Injury Fund v. Mich Coal Co.,* 274 N.W.2d 300, 304 (Iowa 1979). *See Second Injury Fund v. Neelans,* 436 N.W.2d 355, 357 (Iowa 1989) (noting that it was unclear whether the second injury in the *Mich Coal* case was a scheduled or unscheduled injury). Because Nelson's shoulder injury is not a scheduled injury and therefore, does not fall within section 85.64, the Second Injury Fund has no liability. The district court correctly ruled that the commissioner erred in holding otherwise.

VII. *Disposition.*

The judgment entered against Basic Materials Corp. and Wausau Insurance Companies is reversed and the case is remanded so the commissioner can make new findings of fact and conclusions of law in accordance with this decision. The judgment in favor of the Second Injury Fund is affirmed.

**AFFIRMED IN PART, REVERSED IN PART, AND REMANDED.**