# IN THE COURT OF APPEALS OF IOWA

No. 14-1467
Filed January 13, 2016

**GLEESON CONSTRUCTORS AND ENGINEERS, LLC, and TRAVELERS INDEMNITY CO. OF CONNECTICUT,**
        Respondents-Appellants,

**vs.**

**JOE MADRIGAL,**
        Petitioner-Appellee.
_____

        Appeal from the Iowa District Court for Polk County, Jeanie K. Vaudt, Judge.


        An employer and its insurance carrier appeal from the district court order affirming the workers' compensation commissioner's award of total disability benefits to the petitioner.  **AFFIRMED.**



        Patrick V. Waldron and Jason W. Miller of Patterson Law Firm, L.L.P., Des Moines, for appellants.

        Chadwyn D. Cox of Reynolds & Kenline, P.C., Dubuque, for appellee.


        Considered by Danilson, C.J., McDonald, J., and Goodhue, S.J.*

        *Senior judge assigned by order pursuant to Iowa Code section 602.9206 (2015).

**GOODHUE, Senior Judge.**

Joe Madrigal injured his back on August 26, 2009, while working for Gleeson Constructors and Engineers, LLC.   The workers' compensation commissioner awarded total disability benefits against Gleeson and its insurer, Travelers Indemnity Co. of Connecticut.   Gleeson and Travelers have appealed after the district court affirmed the commissioner's award.

## I.  Background Facts

Madrigal was born in Mexico in May 1973, where he graduated from high school.  After high school he attended college for three semesters in Mexico and studied electricity.   Madrigal came to the United States in 1989 or 1990 and became a United States citizen in 2006.  An interpreter was used at the hearing before the commission, but in some of the medical visits his wife, Maria, was the only interpreter.  At other medical visits the provider was a Spanish speaker or an interpreter was used.

Madrigal has primarily worked at labor-intensive jobs.  He began working for Gleeson in 2007 and was working with concrete at a worksite in Dubuque when he developed a pain in his low back.  By midafternoon he took a restroom break and had trouble getting off of the stool.  Coworkers were needed to help him get to the construction site office.  As he explained it, his back "locked up." He was unable to work the rest of that day but continued to work at light duty with Gleeson until he underwent surgery.  In October 2009, he received an injection in his back, but it did not help a great deal.  He took medications and engaged in physical therapy while he continued to work but quit in December 2009 when he underwent surgery.   He has not worked at Gleeson or elsewhere since the

surgery. He has been examined and treated by multiple physicians and therapists since the surgery, and their collective opinion is that the surgery was successful and there remains no objective physical impairment to his back that can be ascertained. Nevertheless, Madrigal reports that although there was some relief as the result of the surgery, he still experiences periodic excruciating back pain and frequent locking of his back. He testified that his pain extends from his left buttock onto his heel and he has lost strength in his leg. He usually uses a cane when walking. He recounts he can neither sit nor stand for extended periods but must alternate between the two positions. He sleeps fitfully and awakens frequently because of the pain and the uncontrollable jerking in his left leg. He intermittently loses bladder control, and his activities are limited to short periods of household work and short periods of driving an automobile. Maria testified that he has had a personality change and frequently becomes antisocial and does not join in activities with his two teenage children. The reports of medical providers who have treated him indicate he is depressed and has anger problems.

The pain and disability as set out above is subjective. No objective cause has been determined as the source of the discomfort. Without a determined cause or injury, further surgery would be of no value. The postoperative treatment has been limited to physical therapy and medications. There is an agreement among those who have examined and treated Madrigal that he needs to become more active and further therapy is the only cure to his present condition. There is also general agreement that Madrigal is experiencing pain and because of his pain, his movements are limited and weight restrictions are

appropriate. It appears that the required remedial activity increases the pain to the point that Madrigal considers it intolerable. He does find water therapy tolerable and goes to a pool three times a week, but medical opinions in the record state that water therapy is not enough to overcome his discomfort and increase his mobility.

Medical reports indicate he has attained maximum medical improvement. There is no dispute that the August 26 injury necessitated the operation and that the pain that still exists relates to the injury or the operation. The dispute centers around the degree of pain Madrigal continues to experience, how it impacts his ability to work in a competitive labor force, and to what extent his pain and his ability to work are the product of his inactivity, failure to do therapy, and exaggeration.

The subjective nature of Madrigal's complaints makes his credibility an issue. Gleeson contends that Madrigal has a history of inaccurate medical reporting. The inaccurate medical reports cluster around a preexisting liver problem, apparently resulting from Madrigal's previous battle with mononucleosis, and Madrigal's unsubstantiated belief that further surgery would eliminate his pain. When treatment on his back commenced, Madrigal failed to advise the medical providers of his liver problem. When liver problems were detected, a provider conjectured that it had been created by the prescribed medication. Thereafter, Madrigal and Maria insisted that medications were having an adverse effect on his liver, although they were later assured by medical personnel that it had no effect. Further surgery had been suggested by medical providers, but a subsequent MRI did not show any continuing

physiological problem resolvable by surgery. Madrigal and Maria at one point told a treating physician that three other surgeons had recommended further surgery, but it was discovered that the representation had been fabricated. Apparently Madrigal was desperate for relief and hoped that surgery would be the answer.

Gleeson also contends Madrigal has a history of attempting to avoid work. The record indicates that over the course of his work history and previous to his employment with Gleeson, Madrigal had on occasion requested time off for medical reasons that were denied by his employer. He also made a disability claim that was denied by an examining medical professional.

Gleeson also contends Madrigal is exaggerating the pain he experiences. There were three functional capacity exams administered that were considered invalid because of inconsistency in Madrigal's responses, based in part on what was considered invalid efforts or reporting on Madrigal's behalf. Nevertheless, there were tests that were considered to be valid that established Madrigal's inability to compete in the labor market. On December 15, 2011, Madrigal underwent a functional capacity evaluation that the evaluator considered to be valid. That test indicated Madrigal would be able to do appropriate light duty work while experiencing back pain but his functions would be slower when the pain elevated. The evaluator opined that Madrigal would be able to do appropriate light-duty work but acknowledged it was only a two hour test that he had administered and that it was possible that Madrigal could not work a full eight-hour shift. A "hands on" employability assessment was undertaken in August 2012 by Area Residential Care at the request of Iowa Vocational

Rehabilitation Services. Madrigal was given a three-day light-duty temporary part-time job at the care center. The assessment indicated Madrigal showed a good work ethic, was motivated, followed directions, and stayed on task. The conclusion of Area Residential Care, adopted by the Iowa Vocational Rehabilitation Services, was that Madrigal had a genuine physical disability that posed a barrier to competitive employment. Laughlin Management Vocational Rehabilitation Specialists reviewed the relevant background information and the medical restrictions that had been placed on Madrigal and opined that he suffered a 98—100% loss of access to a transferable occupation. Lack of English-speaking skills and computer skills greatly increased his lack of employment opportunities.

Madrigal has applied at approximately twenty-five to thirty businesses for employment and received a call-back from only two. He was disqualified on one because of his lack of language skills and on the other because of his inability to stand for extended periods of time.

Madrigal has attempted to obtain social security benefits because of his physical condition on two different occasions but has been denied both times. On December 6, 2011, a hearing was held to consider Madrigal's social security claim. The decision denying benefits was primarily based on functional capacity exams that determined that Madrigal was unable to perform tasks for relevant work, but he did have the ability to do light work such as the assembly of small products, produce sorting, or acting as a cafeteria attendant.

## II.  Error Preservation

An issue must be raised both before the commissioner and in the petition for judicial review to the district court before error is considered to have been preserved.  *Armstrong Tire & Rubber Co. v. Kuble*, 312 N.W.2d 60, 64 (Iowa Ct. App. 1981).  The entitlement to disability benefits was raised at both levels.  Error has been preserved.

## III.  Scope of Review

In review of the district court's decision, the standards of Iowa Code chapter 17A (2013) are applicable.  *Second Injury Fund of Iowa v. Nelson*, 544 N.W.2d 258, 264 (Iowa 1995).  A commissioner's disability determination involves an application of law to the facts, and we will not disturb it unless the commissioner's decision is irrational, illogical, or wholly unjustified.  *Neal v. Annett Holdings, Inc.*, 814 N.W.2d 512, 526 (Iowa 2012).  The agency's decision may be reversed, modified, or remanded if not supported by substantial evidence or affected by an error of law.  *Nelson*, 544 N.W. 2d at 264.

## IV. Discussion

Gleeson contends that the law as applied to the evidence does not support the finding that Madrigal is permanently and totally disabled, and therefore, its rights have been prejudiced by the agency's decision.  Gleeson also contends that the agency placed the burden of mitigation on it and to do so was irrational, illogical, and unjustifiable, and when the record is viewed as a whole, substantial evidence does not support the finding Madrigal is permanently and totally disabled.

Industrial disability is not the same as functional disability but it includes other factors which are to be considered such as age, education, work experience, employer's qualifications, intellectual, emotional, and physical and other factors which may contribute to a loss of earning capacity. *I.B.P., Inc. v. Al-Gharib*, 604 N.W.2d 621, 632-33 (Iowa 2000). Dr. John Kuhnlein did an independent medical examination on January 24, 2012, and although critical of Madrigal for not being more active, stated in his report,

> The prognosis for complete symptom resolution appears to be nil. The prognosis for unrestricted return to work appears to be nil. The prognosis for return to work with appropriate accommodations should be excellent but I will have to say it is guarded based on the nonphysiologic behaviors in examination and the length of time he has been off work.

Three of the examining or treating physicians, including Dr. Kuhnlein, opined Madrigal was not a malingerer.

Dr. Kuhnlein's medical evaluation, Madrigal's "hands on" test as reported by Area Residential Care and adopted by Iowa Vocational Rehabilitation Services, and the Laughlin Management report were all finalized after the social security hearing. Taken together, they verify a loss of earning capacity and the conclusion that Madrigal was totally disabled.

The deputy commissioner in its arbitration decision had held that the greater weight of the evidence of those who had done a vocational study had concluded that Madrigal was not employable. On review, the commissioner considered the deputy's assertion to be error and noted that Madrigal's and Gleeson's vocational consultants' testing as to Madrigal's ability to return to the competitive labor market were in conflict. Gleeson contends the commissioner's

correction of the deputy's finding meant that the commissioner had found Madrigal had not established an inability to enter the labor force. That conflicting evidence existed as to Madrigal's employability does not establish substantial evidence that unemployability did not exist. The commissioner acknowledged the conflict but based its decision on the medical reports stating, "it is the medical opinions as to restrictions on function and employability that are more persuasive than the opinions of vocational experts." The commissioner later stated, "[I]t is concluded that claimant is presently disabled for work and his work injury totally disabled him at the time of the arbitration hearing from performing work with his experience, training, and physical capacity." The record is replete with weight and movement restrictions medical providers placed on Madrigal because of his back pain. The commissioner's conclusion that Madrigal is permanently and totally disabled is not irrational, illogical, or wholly unjustified.

We are bound by the commissioner's finding of facts supported by substantial evidence. *Mycogen Seeds v. Sands*, 686 N.W.2d 457, 465 (Iowa 2004). Substantial evidence means "the quantity and quality of evidence that would be deemed sufficient by a neutral, detached, and reasonable person, to establish the fact at issue when the consequences resulting from establishment of that fact are understood to be serious and of great importance." Iowa Code § 17A.19(10)(f)(1). Clearly, Madrigal's physical condition is based on subjective symptoms and Gleeson has attacked his credibility, but the court is not allowed to re-determine the commissioner's findings of credibility. *See Arndt v. City of LeClaire*, 728 N.W.2d 389, 394-95 (Iowa 2007).

At the end of the commissioner's appeal decision, the commissioner encouraged the defendants to adopt the suggestion of Dr. Kuhnlein to engage Madrigal in aerobic activity and pain management, and help locate medically-appropriate jobs. He further stated that Madrigal had not proven the psychological component to his inability to overcome his pain and loss of function but that active medical health treatment might be appropriate. Gleeson attacks the commissioner's comments as shifting the burden of mitigation onto it. The medical reports frequently mentioned Madrigal's depression and mental state. The commissioner was only commenting that no responsibility had been placed on Gleeson for Madrigal's mental condition but was suggesting the likelihood of a connection between Madrigal's pain and his mental condition, and that addressing the latter might affect the former. The commissioner did not order Gleeson to mitigate Madrigal's damage, and although he acknowledged Madrigal's mental health was not an issue, he suggested assistance with Madrigal's mental health might accelerate his recovery.

The commissioner's conclusion that Madrigal is permanently and totally disabled is not irrational, illogical, or unjustified based on the application of law to facts. His decision is not contradictory and does not place the responsibility to mitigate on the employer. Finally, when the record is viewed as a whole, there is substantial evidence supporting the commissioner's decision.

**AFFIRMED.**