# IN THE COURT OF APPEALS OF IOWA

No. 20-0027
Filed April 28, 2021

**RUKHSANA DRAHOZAL,**
        Petitioner-Appellant/Cross-Appellee,

**vs.**

**ENVOY AIR, INC., d/b/a AMERICAN AIRLINES GROUP and NEW HAMPSHIRE INSURANCE COMPANY,**
        Respondents-Appellees/Cross-Appellants.
_____

        Appeal from the Iowa District Court for Polk County, Scott D. Rosenberg, Judge.

        Rukhsana Drahozal and Envoy Air, Inc. appeal and cross-appeal the decision of the Iowa Workers' Compensation Commissioner. **AFFIRMED ON APPEAL; AFFIRMED IN PART, REVERSED IN PART, AND REMANDED ON CROSS-APPEAL.**

        Thomas Wertz of Wertz Law Firm, Cedar Rapids, for appellant.

        Jean Z. Dickson and Lori N. Scardina Utsinger of Betty, Neuman & McMahon, P.L.C., Davenport, for appellees.

        Heard by Bower, C.J., and Doyle and Mullins, JJ.

**BOWER, Chief Judge.**

Rukhsana Drahozal appeals the district court ruling on judicial review of a decision by the Iowa Workers' Compensation Commissioner, seeking a finding of permanent total disability and additional penalty benefits. Envoy Air, Inc., doing business as American Airlines Group, and its insurer, New Hampshire Insurance Company, (collectively "AA") cross-appeal the same ruling, claiming Drahozal only sustained scheduled injuries, did not establish an industrial disability, the court should not have awarded penalty benefits, and Drahozal was not entitled to healing-period benefits. We affirm the commissioner's rulings on industrial disability and healing-period benefits. We affirm in part and reverse in part the commissioner's penalty-benefits ruling and remand to the district court with instructions.

## I. Background Facts & Proceedings

The district court clearly identified the relevant facts:

> Drahozal was injured while employed by American Airlines working at the Eastern Iowa Airport in Cedar Rapids, Iowa. She had been employed by them for approximately sixteen years. As part of her duties, Drahozal was responsible for de-icing the planes in the winter. On January 4, 2015, while she was de-icing the planes, seepage from the de-icing solution soaked through her gloves onto her hands. Because her hands were already cold and thus partially numb, she did not realize the possible damage that had occurred. Over the next few days after the incident, Drahozal's fingers began turning "reddish-brown" causing her to decide she needed to report the injury to her supervisor.
> On January 11, 2015, Drahozal went to the St. Luke's Emergency Department for pain and swelling in her fingers. She was diagnosed with frostbite of eight fingers with a blister and necrosis by Dr. Nathan Harmon, M.D. Dr. Harmon referred Drahozal to the University of Iowa Hospitals and Clinics (UIHC) Burn Treatment Center.
> Drahozal was seen at the UIHC Burn Center on January 12, 2015. She was seen by Robin Behr, Advanced Registered Nurse

Practitioner. Behr tended to Drahozal's wounds and prescribed . . . a prescription pain medication.

Drahozal visited the UIHC Burn Center again for pain in her fingertips on January 22, 2015 and was again seen by Behr. Behr noted Drahozal had "firm, black eschar on the end of digit 2 of the left hand. The distal ends of digit 2 of left hand and digit 3 of right hand are hardened to touch and fingertips with minimal sensation." Behr prescribed [a different] prescription pain medication to treat the pain.

Drahozal was seen again on January 29, 2015, at the UIHC Burn Center by Robert Lewis II, Physician Assistant. Lewis found Drahozal suffered frostbite to all of her fingers except to her fifth digit, or "pinky finger." Lewis further found the deepest injury was to her middle finger tips as they were swollen and showed a loss of tissue. Lewis restricted Drahozal to temperatures between sixty and eighty degrees and told her to avoid harsh chemicals and blunt trauma. Lewis then recommended Drahozal wait one-year before having an impairment evaluation in order to monitor how her fingers recover over time.

Drahozal continued treatment and, at one point, a brown tip fell off her finger. She remained in pain, her hands were stiff and she was mostly unable to use her hands for their regular functions. Gretchen Kass, Advanced Registered Nurse Practitioner, prescribed [another medication] for the pain, referred her to occupational therapy, and restricted Drahozal from working.

On March 19, 2015, Drahozal was seen at the UIHC Burn Clinic for extreme pain in her fingers causing her anxiety. Lewis prescribed [medication] to help Drahozal sleep and referred her to the UIHC Pain Management Clinic and for counseling services.

Drahozal began receiving treatment at the UIHC Pain Management Clinic in July 2015. She saw Dr. Shuchita Garg, M.D. who recommended pharmacologic treatment, use of a TENS unit,[1] desensitization exercises, occupational therapy, pain psychology, and counseling.

Drahozal attended an appointment with Frank Gersh, Ph.D, as an authorized workers compensation psychological provider on October 27, 2015. Dr. Gersh diagnosed Drahozal with major depressive disorder, single episode, moderate. She continued to receive treatment from Dr. Gersh who restricted Drahozal from working on January 13, 2016.

---

[1] "A transcutaneous electrical nerve stimulation (TENS) unit is a device that sends small electrical currents to targeted body parts. These currents are used to relieve pain. . . . These pulses control pain signals in the body, creating temporary or permanent relief from pain." *Transcutaneous Electrical Nerve Stimulation Unit*, Healthline, https://www.healthline.com/health/transcutaneous-electrical-nerve-stimulation-unit (last visited Apr. 2, 2021).

Dr. Joseph Chen, M.D. conducted an independent medical examination of Drahozal on January 25, 2016. He diagnosed her with chronic bilateral fingertip pain related to a work injury. He opined that no further treatments were likely to help and all treatments should be discontinued. Dr. Chen placed Drahozal on maximum medical improvement [(MMI)] and released Drahozal to return to work with no restrictions. Dr. Chen assigned a two percent body as a whole impairment rating.

Dr. Gersh continued to treat Drahozal every two weeks for major depressive disorder which he confirmed was related to her work injury. He reported she needed additional treatment and referred Drahozal to psychiatrist, Dr. Mark Mittauer, M.D.

On June 3, 2016, New Hampshire informed Drahozal that because Dr. Chen had placed her at [MMI], without restrictions, they would not pay [additional] healing period benefits.

On June 24, 2016, Drahozal had a psychiatric evaluation with Dr. Mittauer. Dr. Mittauer diagnosed Drahozal with major depressive disorder, single episode, severe, without psychotic features, generalized anxiety disorder, other specified anxiety disorder including panic attacks and an insomnia disorder. Dr. Mittauer prescribed [medications] and discontinued the use of [the prior sleep medication].

During this time, . . . an unrelated [family event occurred,] which New Hampshire claims caused Drahozal's continued symptoms.

[On June 27, 2016, Dr. Gersh informed New Hampshire that Drahozal was participating more in activities of daily life and no restrictions had been imposed on her ability to work. Dr. Gersh recommended Drahozal not return to work until employment could be found that she could perform despite her hand sensitivity and pain.]

On July 20, 2016, Drahozal notified [AA] she was retiring.

On September 1, 2016, Dr. Mittauer issued an opinion letter diagnosing Drahozal with major depressive disorder caused by her January 2015 work injury.

New Hampshire retained two doctors to conduct independent psychiatric evaluations of Drahozal, Dr. Terrence Augspurger, M.D., and Amy Mooney, Ph.D. They each reviewed the records and examined Drahozal. They both diagnosed Drahozal with major depressive disorder, recurrent, with prior depressive episodes following pregnancy and delivery, severe with anxious distress, and other specified personality disorder with borderline dependent features. They found no causation, claiming if a history of previous episodes were acknowledged, then any new episode is likely just a

manifestation of the pre-existing event based on the AMA Guide to the Evaluation of Disease and Causality and Injury Causation.[2]

On October 3, 2016, New Hampshire informed Drahozal that her injuries were due to stress caused by family events and not her work injury and additional treatment would not be authorized.

[On February 10, 2017,] Dr. Mittauer responded to the report prepared by Drs. Augspurger and Mooney and said they provided no documentation of any symptoms Drahozal had at the time of postpartum depression that would lead to their diagnosis. Dr. Mittauer opined that Drahozal's depression following the delivery of her children did not manifest severe enough symptoms to meet the criteria for major depressive disorder and that any symptoms from that event had resolved completely. He also opined she had sufficient symptoms to satisfy a separate diagnosis of generalized anxiety disorder. [Dr. Mittauer then placed her at MMI as to her psychiatric conditions and opined her mental health would "interfere with her ability to participate in full-time gainful employment."]

On March 22, 2017, New Hampshire sent Drahozal a letter informing her that because Dr. Augspurger did not find causation, they were disputing all liability as to further care and treatment including the mental health treatment.

On April 17, 2017, Dr. Gersh opined he had diagnosed Drahozal with major depressive disorder and opined it was caused by her work injury. . . . Drahozal also retained Dr. Sunil Bansal, M.D., an occupational medicine physician to conduct an independent medical examination. Dr. Bansal opined Drahozal suffered frostbite and assigned a nine percent body as a whole impairment for the dominant right hand injuries and a four percent body as a whole impairment for the left hand, with a thirteen percent total body as a whole impairment. Dr. Bansal recommended a five pound lifting restriction and no frequent squeezing, pinching or grasping.

Dr. Bansal also diagnosed Drahozal with complex regional pain syndrome in her hands.

On June 5, 2017, Dr. Mittauer prepared an opinion letter citing Drahozal's work injury as "a substantial contributing factor" to her mental-health disorders. Dr. Mittauer opined Drahozal's depression, anxiety, and insomnia disorders were

---

[2] Drahozal's youngest child had been born around twenty-five years earlier, and she had not previously been diagnosed with post-partum depression.

permanent conditions and would "more likely than not" continue as long as she had persistent pain and associated disability.

When asked for his opinion, Dr. Chen disagreed with the complex-regional-pain-syndrome diagnosis, instead suggesting pain and fear-avoidance behaviors related to anxiety could explain the signs and symptoms.

Drahozal filed a petition in arbitration with the workers' compensation commissioner on July 18, 2016 (two days before her retirement). She listed as the part of the body affected or disabled "body as a whole." AA admitted the finger injuries but denied any psychiatric sequelae.

The arbitration hearing occurred on August 14, 2017. Drahozal was still seeing Dr. Gersh and Dr. Mittauer, but her appointments had decreased to one every six weeks. She reported feeling much better in the past six months. Drahozal testified she had to modify how she performed activities with her hands due to numbness and sharp pain at times. With regard to her mental health, she reported a lack of confidence and motivation and poor energy. Drahozal had not applied for any jobs since retiring in July 2016, stating, "I don't think I'm ready to do anything. Eventually I will be." She later mentioned wanting to volunteer in a classroom in the school system.

The arbitration decision was filed December 21, 2017. The deputy commissioner found Dr. Chen's and Dr. Mittauer's expert opinions the most persuasive. The deputy found Drahozal "established she sustained mental-health sequelae as a result of her work injury, and thus has established she has sustained an industrial disability." The deputy found Drahozal was "capable of retraining" and had failed to establish a permanent total disability under statute or under the

odd-lot doctrine. The deputy found Drahozal sustained an eighty-percent industrial disability as a result of the frostbite and mental-health injury and awarded her 400 weeks of permanent partial disability benefits. The deputy adopted Dr. Mittauer's MMI determination for Drahozal's mental health and awarded healing benefits for the period from January 12, 2015, through February 10, 2017. The deputy also awarded penalty benefits for eleven delayed payments of Drahozal's weekly benefits[3] but denied penalty benefits related to the mental-health sequela injury, finding "at the time of the denial, the claim was fairly debatable."

Both parties appealed to the commissioner. On September 12, 2018, the commissioner affirmed and adopted the arbitration decision in its entirety.

Drahozal filed a petition for judicial review of the commissioner's decision, asserting all the grounds for reversal allowed under Iowa Code section 17A.19(10) (2017), without stating any specific facts or assertions relating to any particular ground. AA filed a counter-petition for judicial review, asserting many of the same legal grounds as Drahozal.

On April 5, 2019, the district court held a hearing in the matter. The district court found substantial evidence supported the ruling of the commissioner and affirmed on all issues. Drahozal appeals, and AA cross-appeals.

**II. Scope and Standard of Review**

"Judicial review of workers' compensation cases is governed by Iowa Code chapter 17A. On our review, we determine whether we arrive at the same

---

[3] The delayed payments were issued February 6, March 2, April 27, and June 22, 2015, as well as February 2, 17, 22, and March 15, 2016.

conclusion as the district court." *Warren Props. v. Stewart*, 864 N.W.2d 307, 311 (Iowa 2015) (citation omitted).

> A district court decision rendered in an appellate capacity is examined for correction of errors at law. In making such a determination, we apply the standards of Iowa Code section 17A.19[(10)], which provides an agency decision may be reversed where substantial rights of a party have been prejudiced and the action is unsupported by substantial evidence or affected by errors of law, to determine if our conclusion would be the same as that of the district court.

*Christensen v. Snap-On Tools Corp.*, 554 N.W.2d 254, 257 (Iowa 1996) (citation omitted); *see also Puntenney v. Iowa Utils. Bd.*, 928 N.W.2d 829, 836 (Iowa 2019).

"Just because the interpretation of the evidence is open to a fair difference of opinion does not mean the commissioner's decision is not supported by substantial evidence. An appellate court should not consider evidence insubstantial merely because the court may draw different conclusions from the record." *Arndt v. City of Le Claire*, 728 N.W.2d 389, 393 (Iowa 2007) (citation omitted). "'Substantial evidence' means the quantity and quality of evidence that would be deemed sufficient by a neutral, detached, and reasonable person, to establish the fact at issue when the consequences resulting from the establishment of that fact are understood to be serious and of great importance." Iowa Code § 17A.19(10)(f)(1). "It is the commissioner's duty as the trier of fact to determine the credibility of the witnesses, weigh the evidence, and decide the facts in issue. The reviewing court only determines whether substantial evidence supports a finding '*according to those witnesses whom the [commissioner] believed*.'" *Arndt*, 728 N.W.2d at 394–95 (alteration in original) (citations omitted).

**III. Drahozal's Appeal**

Drahozal appeals (1) the commissioner's determination her frostbite injuries did not result in permanent total disability and (2) the commissioner not awarding penalty benefits for the denied healing-period benefits related to the mental-health sequela injury between June 2016 and February 2017.

**A. Disability Rating.** Drahozal's first claim on appeal is the commissioner erred in not finding she was permanently and totally disabled under the statute or the odd-lot doctrine. Drahozal argues the combination of her hand injuries, depression, age, and education level means there are no jobs in the community for which she can realistically compete. Drahozal claims,

> The only factor which weighed against a finding of permanent and total disability was Drahozal's lack of motivation to find work and therefore, lack of work search. However, it was arbitrary and/or capricious for [the deputy], the commissioner, and the district court to use Drahozal's alleged "lack of motivation" against her because her lack of motivation stemmed directly from her work injury.

"Industrial disability measures an injured worker's lost earning capacity." *Second Injury Fund v. Nelson*, 544 N.W.2d 258, 265 (Iowa 1995). The focus of an industrial disability determination is the ability of the claimant to be gainfully employed; it is not merely an evaluation of what the claimant can or cannot do. *Id.* at 266. We inquire whether "there [are] jobs in the community that the employee can do for which the employee can realistically compete." *Second Injury Fund v. Shank*, 516 N.W.2d 808, 815 (Iowa 1994). This requires consideration of those factors that bear on the claimant's employability, including "age, intelligence, education, qualifications, experience, and the effect of the injury on the worker's

ability to obtain suitable work.'" *Guyton v. Irving Jensen Co.*, 373 N.W.2d 101, 103 (Iowa 1985).

Drahozal ignores the substantial evidence weighing in favor of the commissioner's ruling. Dr. Chen released her to return to work with no medical restrictions in early 2016. Dr. Mittauer's 2017 evaluation found Drahozal's mental health would interfere with *full-time* gainful employment, but that allows space for Drahozal to work at a job with reduced hours. At the arbitration hearing, Drahozal reported feeling better and having less anxiety and stated she was taking up more tasks at home. After observing Drahozal's testimony and reviewing the evidence, the deputy found "Drahozal is capable of retraining" but was not motivated to return to work. Substantial evidence supports the commissioner's finding Drahozal's earning capacity had been reduced by eighty percent as a result of her hand injuries and mental-health sequela, but she was capable of some level of employment.

*Odd-Lot Doctrine.* Drahozal asserts if she is not permanently totally disabled under the statute, then the court should apply the odd-lot doctrine to find her incapable of obtaining employment.

"An odd-lot employee is one who is incapable of finding work in any established branch of the labor market." *Nelson*, 544 N.W.2d at 267. The burden is on the employee to produce "substantial evidence that the worker is not employable in the competitive labor market." *Id.* (emphasis omitted) (quoting *Guyton*, 373 N.W.2d at 106). "[I]t is 'normally' incumbent on the claimant 'to demonstrate a reasonable effort to secure employment' in the worker's area of

residence before the burden of producing evidence shifts to the employer." *Id.* (citations omitted).

To make a prima facie case of odd-lot disability, Drahozal had the burden of producing substantial evidence she was not employable in *any* capacity in her labor market, not just that she could not perform her former job. Drahozal produced no evidence to support her claim of being unable to work—she did not apply for any jobs, did not seek an evaluation from a vocational rehabilitation specialist, and did not produce evidence she was not employable in the Cedar Rapids labor market.

The deputy commissioner found Drahozal failed to present a prima facie case of odd-lot unemployability. The commissioner agreed "claimant failed to carry her burden of proof that she is permanently and totally disabled under either the traditional industrial disability analysis or under the odd-lot analysis." We affirm.

**B. Denied Penalty Benefits.** Drahozal claims the court erred in not awarding her penalty benefits for the period of June 6, 2016, through February 10, 2017, when AA denied healing period benefits to cover her mental-health treatment.

The Iowa Code specifies when the commissioner is to award penalty benefits:

> If a denial, a delay in payment, or a termination of benefits occurs without reasonable or probable cause or excuse known to the employer or insurance carrier at the time of the denial, delay in payment, or termination of benefits, the workers' compensation commissioner shall award benefits in addition to those benefits . . . up to fifty percent of the amount of benefits that were denied, delayed, or terminated without reasonable or probable cause or excuse.

Iowa Code § 86.13(4)(a). A "reasonable or probable cause or excuse" must be preceded by a reasonable investigation and evaluation into whether benefits are owed; the results of the investigation were the basis upon which the employer relied for denial, delay, or termination; and the employer or insurance carrier informed the employee of that basis at the time of the denial, delay, or termination. *Id.* § 86.13(4)(c)(1)–(3).

Healing period benefits "sustain[ ] the injured employee during convalescence and disability from work." *Waldinger Corp. v. Mettler*, 817 N.W.2d 1, 7 (Iowa 2012). The employer owes the employee healing period compensation

> beginning on the first day of disability after the injury, and until the employee has returned to work or it is medically indicated that significant improvement from the injury is not anticipated or until the employee is medically capable of returning to employment substantially similar to the employment in which the employee was engaged at the time of injury, whichever occurs first.

Iowa Code § 85.34(1).

When evaluating whether penalty benefits were owed between June 2016 and February 2017, the commissioner adopted the arbitration ruling:

> After receiving the opinion from Drs. Augspurger and Mooney of no causation, American and New Hampshire denied causation with respect to Drahozal's alleged mental health sequela injury. American and New Hampshire notified Drahozal of the denial. Based on the opinions received at the time of the denial, the claim was fairly debatable. I decline to award penalty benefits on this ground.

AA stopped paying healing-period benefits in March 2016, relying on Dr. Chen's opinion Drahozal had reached MMI and could return to work without restrictions. Dr. Chen's report indicated he discussed Drahozal's condition extensively with her and what activities she was medically able to do.

In April 2016, Dr. Gersh wrote to inform Drahozal's counsel he had been notified treatment was no longer authorized and his treatment of her "was related to her frostbite injury." Counsel for AA in May indicated Drahozal "is still at MMI so we would not be reinstating healing period." Counsel again informed Drahozal's counsel in June she would not be paid additional healing period benefits because Dr. Chen placed her at MMI and released her to full duty, so "there is no medical [reason] which keeps your client off work."

Causation and compensability of Drahozal's mental health continued to be disputed by Drahozal and AA at the arbitration hearing and through all subsequent appeals. Drahozal reached MMI on her physical injury, which had paused her employment, and was released as medically capable to return to work. Under all the circumstances, we conclude substantial evidence supports the commissioner's denial of penalty benefits between June 2016 and February 2017. We affirm.

**IV. AA's Cross-Appeal**

AA asserts three claims in its cross-appeal relating to the mental-health sequela and the penalty benefits awarded by the commissioner.

**A. Mental-Health Sequela.** First, AA asserts the commissioner erred in finding Drahozal's depression was a result of her work injury and instead the commissioner should have found minimal industrial disability. AA relies on Dr. Augspurger and Dr. Mooney's evaluation of Drahozal's mental health and

states substantial evidence only supports the scheduled-member injuries to Drahozal's fingers.[4]

On appeal, we do not re-weigh the evidence to come to a new finding. *Arndt*, 728 N.W.2d at 395. Rather, we merely determine if substantial evidence supports a finding according to the evidence believed by the commissioner. *Id.* The reports from both Dr. Gersh and Dr. Mittauer support the commissioner's finding Drahozal's work-related physical injuries caused her to experience a "major depressive episode" affecting her ability to work. The commissioner found Dr. Mittauer was more persuasive than Dr. Augspurger and Dr. Mooney regarding the question of Drahozal's mental-health injury. *See Cedar Rapids Cmty. Sch. Dist. v. Pease*, 807 N.W.2d 839, 845 (Iowa 2011) ("Ultimately, however, the determination of whether to accept or reject an expert opinion is within the 'peculiar province' of the commissioner." (citation omitted)). Substantial evidence thus supports the commissioner's finding Drahozal experienced mental-health sequela as a result of her work injury.

**B. Awarded Penalty Benefits.** Next, AA contests the penalty benefits awarded to Drahozal in the amount of $3611 relating to eleven late healing-period benefit payments.

Iowa Code section 85.30 prescribes the time for investigation and requires "[c]ompensation payments shall be made each week beginning on the eleventh day after the injury, and each week thereafter during the period for which

---

[4] The workers' compensation act establishes a predetermined permanent partial disability compensation for injuries or loss of specific body parts, including a set amount for the loss of each full or partial finger. Iowa Code § 85.34(2)(a)–(f).

compensation is payable." "[I]f Monday is the first day of the compensation week, full payment of the weekly compensation is due the following Monday." *Robbennolt v. Snap-On Tools Corp.*, 555 N.W.2d 229, 235 (Iowa 1996). "[W]eekly compensation payments are 'made' when they are mailed to the claimant, not when they are received." *Id.* at 236.

Drahozal sustained her injury on January 4, 2015, though it is unclear if she reported it before January 11. The first payment was issued on February 6, 2015. AA states the initial check's delay at the beginning of the injury was necessary time for investigation of the claim and obtaining medical opinions and records. However, even counting from when Drahozal ceased working on January 12, Drahozal was owed her first compensation payment two weeks before AA issued it. This delay was unreasonable, and the commissioner did not err in awarding penalty benefits.

Five of the late payments—issued on March 2, March 15, April 27, June 22, 2015, and February 22, 2016—were issued the Monday after the compensation week. The compensation week for each of the payments started the Monday before, and AA argues that under *Robbennolt* the payments were due on the days the checks issued. *See* 555 N.W.2d at 235; *see also Goodman v. Snap-On Tools Corp.*, No. 03-0414, 2004 WL 2066941, at *3 (Iowa Ct. App. Sept. 9, 2004) ("The . . . due dates fall on the day after the end of each compensation week . . . that is, the eighth day after the first day of each subsequent compensation week."). Drahozal argues the payments were due at the end of the compensation week, and in any event AA did not prove the payments were mailed out on the date they were issued.

If the five checks were mailed the day they were issued, then they were timely under *Robbennolt*. *See* 555 N.W.2d at 235. If they were mailed on a later date, they were late. Penalty benefits are not awarded under Iowa Code section 86.13(4) unless "[t]he employee has demonstrated a denial, delay in payment, or termination of benefits." Therefore, Drahozal had the burden of demonstrating the checks were mailed late to be awarded penalty benefits. She did not do so. Substantial evidence does not support this portion of the commissioner's ruling.

Four other payments—issued on February 2, February 10, February 17, and March 15, 2016—were issued two or three days late. AA did not provide an explanation for these late-paid benefits. On appeal, AA asserts—without citing any legal authority—the payments were "minimally late" so only a minimal penalty should be assessed. The application of the penalty provision does not turn on the length of the delay in making the correct compensation payment. "Any delay without reasonable excuse entitles the employee to benefits in some amount." *Robbennolt*, 555 N.W.2d at 236. The commissioner correctly awarded penalty benefits for these unexplained late payments.

The final late payment was a March 31, 2016 lump sum payment for permanent partial disability relating to Drahozal's hands based on Dr. Chen's MMI determination. AA claims they needed to conduct a reasonable investigation into the entitlement to permanent benefits. As Drahozal points out, Dr. Chen issued his report on January 25. AA stopped paying healing benefits as of March 14. Any reasonable investigation would have been completed before healing period

benefits were halted. The commissioner did not err in awarding penalty benefits for this late payment.

The commissioner can award up to fifty percent of the amount of unreasonably delayed benefits as a penalty under Iowa Code section 86.13. *See Schadendorf v. Snap-On Tools Corp.*, 757 N.W.2d 330, 336 (Iowa 2008). "The factors the commissioner should consider when awarding penalty benefits are 'the length of the delay, the number of the delays, the information available to the employer regarding the employee's injuries and wages, and the prior penalties imposed against the employer under section 86.13.'" *Id.* (quoting *Robbennolt*, 555 N.W.2d at 238). The penalty benefits awarded are within the statutory limits.

Penalty benefits were wrongly awarded on five payments that Drahozal did not prove were late. Those five payments—each for $328.34—totaled $1641.70. The commissioner awarded a fifty-percent penalty benefit for the late payments—$820.85. Therefore, we reduce the penalty benefits award by $820.85. We affirm the awarded penalty benefits in the amount of $2790.15.

**C. Healing Period Benefits, Medical Expenses, and Costs.** Finally, AA asserts because Drahozal is not entitled to benefits relating to her mental-health sequela, she is not entitled to the related healing-period benefits, medical expenses, or costs and those awards should be reversed. Because we have already confirmed benefits were properly awarded for her mental-health sequela, we affirm these rulings.

**V. Conclusion**

We conclude the district court erred in upholding a portion of the commissioner's penalty-benefits award. We remand to the district court with

instruction to remand the matter to the workers' compensation commissioner to amend the penalty-benefits award consistent with this opinion. On all of the remaining issues, we affirm.

**AFFIRMED ON APPEAL; AFFIRMED IN PART, REVERSED IN PART, AND REMANDED ON CROSS-APPEAL.**